UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. S1-4:15CR00441 CDP |
| TERRANCE WILSON, <br> a/k/a "Mutt," and <br> DONALD STEWART, <br> a/k/a "O.G.," | ) ) ) ) ) ) |
| Defendants. | ) |

### GOVERNMENT'S AMENDED NOTICE OF EXPERTS' NAMES, QUALIFCATIONS, AND SUBJECTS OF TESTIMONY

COMES NOW the United States of America by and through its attorneys, Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Dean R. Hoag and Michael A. Reilly, Assistant United States Attorneys for said District, and pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), hereby provides Defense Counsel with an Amended Notice of Experts' Names, Qualifications, and Subjects of Testimony, in relation to the following expert witnesses that the Government may call at trial:

### FINGERPRINTS

1. **Christi L. Fischer, Drug Enforcement Administration Laboratory (DEA Lab), Supervisory Fingerprint Specialist:**

Ms. Fischer will qualify as an expert witness by virtue of her education, training and experience. Ms. Fischer will testify that she is a latent fingerprint examiner trained in developing, comparing and analyzing latent fingerprints obtained from items of evidence. Although Ms. Fischer is currently in a supervisory role, she has extensive experience processing nonporous items

1

of real evidence for the presence of latent fingerprints. Ms. Fischer will testify consistently with the findings included in her previously disclosed report in relation to DEA Exhibits N-11 through N-13, seized on July 19, 2010.

Ms. Fischer will testify to matters including her analysis of items seized real evidence in the investigation, which failed to reveal the presence of identifiable fingerprints. Ms. Fischer processed items of real evidence in this case by methods including visual examination, the use cyanoacrylate fuming, and rhodamine dye analysis in conjunction with laser analysis.

Ms. Fischer will to testify to basic tenets of fingerprint analysis and identification, including but not limited to: (1) the definition of friction ridge skin, latent prints, and known prints; (2) characteristics consistent with the presence of an identifiable fingerprint; (3) how latent prints are made visible; (4) how a preserved latent print is compared to a known standard; and (5) the many factors affecting the presence or absence of an identifiable fingerprint, including but not limited to: (a) the presence of residue on skin; (b) the nature of the receiving surface; (c) how contact is made the texture of the surface; (d) the presence of gloves; (e) the frequency and manner of subsequent contact with an object subject to latent print analysis; (f) relevant environmental factors; and (g) the size of the receiving surface. Ms. Fischer will testify that based upon the above mentioned factors affecting the presence or absence of identifiable latent fingerprints, that it is possible to touch an object, yet not leave an identifiable latent fingerprint.

    2.    **Charles Schauer, formerly DEA Lab, Fingerprint Specialist:**

Mr. Schauer will qualify as an expert witness by virtue of his education, training and experience. Mr. Schauer will testify that he is a latent fingerprint examiner trained in developing, comparing and analyzing latent fingerprints obtained from items of evidence. He has extensive experience processing nonporous items of real evidence for the presence of latent fingerprints.

Mr. Schauer will testify consistently with the findings included in his previously disclosed reports, including those in relation to DEA Exhibits 2, N-47, N-47a, and N-48, seized on January 9, 2010. Mr. Schauer may also testify to the basic tenets of fingerprint identification science, consistent with that set forth above in relation to Ms. Fischer.

    3.    **Sharon Burnett, formerly St. Louis Metropolitan Police Dept.-Laboratory (SLMPD-Laboratory):**

Ms. Burnett will qualify as an expert witness by virtue of her education, training and experience. Ms. Burnett will testify she was a latent fingerprint examiner trained in comparing and analyzing latent fingerprints obtained from items of evidence, and/or she will testify that she examined a number of latent fingerprints for identification purposes. Ms. Burnett will testify consistently with the finding set forth in her previously disclosed reports, including the identification of the fingerprints of Donald White developed at the murder scene of Christopher Roy on September 9, 2008.

## CHEMISTS

    4.    **Timothy Anderson, Drug Enforcement Administration (DEA-Lab):**

Mr. Anderson will qualify as an expert witness by virtue of his education, training and experience. Mr. Anderson will testify that he conducted scientific tests on various suspected narcotic drugs to determine whether they were controlled substances. He will testify consistently with his reports in relation to DEA Exhibits 1, 4-8, and 11-13, previously disclosed to counsel.

    5.    **Lateefah A. Stanford, formerly DEA-Lab:**

Ms. Stanford will qualify as an expert witness by virtue of her education, training and experience. Ms. Stanford is currently employed as a Senior Scientist at BP Products North America. Ms. Stanford will testify that she conducted scientific tests on suspected narcotic drugs

3

to determine whether they were controlled substances. She will testify consistently with her report in relation to DEA Exhibit 2, previously disclosed to counsel.

      6.    **Joseph Crow, formerly SLMPD-Lab:**

Mr. Crow will qualify as an expert witness by virtue of his education, training and experience. Mr. Crow will testify that he conducted scientific tests on various suspected narcotic drugs to determine whether they were controlled substances. Mr. Crow will testify consistently with his previously produced reports, including in relation to narcotics seizures on February 19, 2010, and September 7, 2010.

      7.    **Allyson Seger, SLMPD-Lab:**

Ms. Seger will qualify as an expert witness by virtue of her education, training and experience. Ms. Seger will testify that he conducted scientific tests on various suspected narcotic drugs to determine whether they were controlled substances. Ms. Seger will testify consistently with her previously produced reports, including in relation to narcotics seizure on August 6, 2010.

      8.    **Matthew Messick, Missouri State Highway Patrol Crime Laboratory Division:**

Mr. Messick will qualify as an expert witness by virtue of his education, training and experience. Mr. Messick may testify that he conducted scientific tests on various suspected narcotic drugs to determine whether they were controlled substances, specifically heroin. Mr. Messick will testify consistently with his report, to be produced forthwith, in relation to the analysis of heroin seized from defendant Wilson on March 28, 2009, at the Missouri correctional facility Licking, Missouri, for which Wilson was convicted in the Circuit Court of Texas County, Missouri, on August 7, 2012, in cause number 09X1-CR00294-01.

## FIREARMS

9. **David Menendez, SLMPD-Lab:**

Mr. Menendez will qualify as an expert witness by virtue of his education, training and experience. Mr. Menendez will testify that he test fired and examined weapons, as well as ballistic evidence that was seized, and conducted microscopic examination of these items for comparison purposes. Mr. Menendez will testify consistently with his numerous reports, previously produced to counsel.

10. **Eric Larson, SLMPD-Lab:**

Mr. Larson will qualify as an expert witness by virtue of his education, training and experience. Mr. Larson will testify that he test fired and examined weapons, as well as ballistic evidence that was seized, and conducted microscopic examination of these items for comparison purposes. Mr. Larson will testify consistently with his numerous reports, previously produced to counsel, including the positive comparison of ballistic evidence seized from the crimes scene of the Ronald James murder on July 28, 2009, and a shooting scene on Holborn Avenue on May 4, 2009. Mr. Larson will also testify to the positive comparison of ballistic evidence seized from the crime scene of the Michael McGill murder on March 26, 2010, and a firearm subsequently recovered on April 26, 2010.

11. **Katherine Castillo, SLMPD-Lab:**

Ms. Castillo will qualify as an expert witness by virtue of her education, training and experience. Ms. Castillo will testify consistent with her previously produced report in relation to ballistic evidence seized from 5127/29 Northland on November 2, 2017.

12. **Michael Wunderlich, St. Louis County Police Dept. (StLCoPD)-Lab:**

Mr. Wunderlich will qualify as an expert witness by virtue of his education, training and experience. Mr. Wunderlich will testify consistently with his previously produced report pertaining to ballistic evidence that was seized on November 25, 2008, in the 11300 block of Birmingham.

13. **Steven Kramer, StLCoPD-Lab:**

Mr. Kramer will qualify as an expert witness by virtue of his education, training and experience. Mr. Kramer will testify consistently with the previously produced report of William George, pertaining to ballistic evidence that was seized on May 4, 2009, on Holborn Avenue, and the positive comparison of said evidence with ballistic evidence seized from the Ronald James murder scene on July 28, 2009. Mr. Kramer assisted William George in said analysis.

14. **William George, StLCoPD-Lab:**

Mr. George will qualify as an expert witness by virtue of his education, training and experience. Mr. George may testify in relation to ballistic evidence that was seized on May 4, 2009, on Holborn Avenue, and the positive comparison of said evidence with ballistic evidence seized from the Ronald James murder scene on July 28, 2009.

## BIOLOGY/DNA

15. **Erin Duke, SLMPD-Lab:**

Ms. Duke will qualify as an expert witness by virtue of her education, training and experience. Ms. Duke is currently the CODIS administrator for the SLMPD-Lab. Ms. Duke will testify to her special training in biological and DNA analysis and that she is a criminalist trained in obtaining DNA from swabs taken from items of evidence. Ms. Duke will testify to the

procedures employed to obtain DNA evidence from items recovered on or about August 30, 2008, from a Dodge Magnum reported carjacked by W.A.

16. **Samantha Webb, SLMPD-Lab:**

Ms. Webb will qualify as an expert witness by virtue of her education, training and experience. Ms. Webb will testify to her special training in biological and DNA analysis. Ms. Webb will testify consistently with her previously produced report in relation the DNA profile developed from material collected by Ms. Duke as set forth above.

17. **Erik Hall, SLMPD-Lab:**

Mr. Hall will qualify as an expert witness by virtue of his education, training and experience. Mr. Hall will testify to his special training in biological and DNA analysis. Mr. Hall will testify consistently with his previously produced reports, including that the DNA profile of Donald White is consistent with the DNA profile developed by Ms. Webb as set forth above. Mr. Hall will also testify consistently with his previously produced report related to the swabbing of a cellular telephone seized from the Demetric Thompson murder scene on September 21, 2010, and the DNA profile material developed from said swabs.

18. **Renee Ho, formerly SLMPD-Lab:**

Ms. Ho will qualify as an expert witness by virtue of her education, training and experience. Ms. Ho will testify regarding her special training in biological and DNA analysis. Ms. Ho will testify consistently with her previously produced reports, including that the DNA profile of Terrance Wilson is consistent with the DNA profile developed from swabbing of the cellular telephone conducted by Erik Hall.

19. **Michael Pollitte, SLMPD-Lab:**

Mr. Pollitte will qualify as an expert witness by virtue of his education, training and experience. Mr. Pollitte may testify that he is a criminalist trained in obtaining DNA from swabs taken from items of evidence, and will testify consistently with his previously produced reports.

## MEDICAL EXAMINERS

20. **Kamal Sabharwal, M.D., formerly St. Louis City Medical Examiner's Office:**

Dr. Sabharwal is currently a medical examiner for the St. Louis County Medical Examiner's Office. He will testify regarding his significant experience in the area of forensic pathology and post-mortem examinations. He will testify consistently with his previously produced report pertaining to the murder of Christopher Roy, in which the cause of death was gunshot wounds and the manner of death was homicide.

21. **Jane Turner, M.D., formerly St. Louis City Medical Examiner's Office:**

Dr. Turner will testify regarding her significant experience in the area of forensic pathology and post-mortem examinations. She will testify consistently with her previously produced report pertaining to the murder of Ronald James, in which the cause of death was gunshot wounds and the manner of death was homicide. Dr. Turner may also testify to the cause and manner of death of Damon Walker, consistent with the autopsy report of Dr. Marianna Esserman, formerly Sandomursky. Dr. Turner was present during the autopsy of Damon Walker.

22. **Raj Nanduri, M.D., formerly St. Louis City Medical Examiner's Office:**

Dr. Nanduri will testify regarding her significant experience in the area of forensic pathology and post-mortem examinations. She will testify consistently with her previously produced report pertaining to the murder of Michael McGill, in which the cause of death was gunshot wounds and the manner of death was homicide.

8

23.  **Stephanie Burton, M.D., formerly St. Louis City Medical Examiner's Office:**

Dr. Burton will testify regarding her significant experience in the area of forensic pathology and post-mortem examinations. She will testify consistently with her previously produced report pertaining to the murder of Darrion Williams, Jr., in which the cause of death was gunshot wounds and the manner of death was homicide.

24.  **Marianna (Sandomirsky) Esserman, M.D., formerly St. Louis City Medical Examiner's Office:**

Dr. Esserman will testify regarding her significant experience in the area of forensic pathology and post-mortem examinations. She will testify consistently with her previously produced report pertaining to the murder of Damon Walker, in which the cause of death was gunshot wounds and the manner of death was homicide.

25.  **Dr. Michael Graham, SLMPD-Lab, Forensic Pathologist:**

Dr. Graham will testify that he has been a forensic pathologist for the past 30 years and has conducted thousands of post-mortem examinations. He will testify consistently with his previously produced report pertaining to the murder of Demetric Thompson, in which the cause of death was gunshot wounds and the manner of death was homicide.

## NARCOTICS TRAFFICKING

26.  **Dr. Salvatore Cira, Dept. of Justice-United States Attorney's Office, Intelligence Research Specialist (IRS):**

Dr. Cira will base his testimony on his education and the experience he received during his tenure as a law enforcement officer, including the years he spent as a DEA analyst and as a St. Louis Metropolitan Police Department Officer. During his career, he has been involved in hundreds of narcotics investigations including those involving search warrants, undercover purchases, judicially authorized wiretaps, informants, interdiction, cooperating individuals, and

arrested subjects who he has debriefed regarding their illegal drug business. During his tenure with the SLMPD, Dr. Cira was a narcotics detective for seven years, and a supervisor in the narcotics unit for ten years. Dr. Cira has significant experience investigating narcotics transportation, distribution and financing at the international level, inter and intrastate level, and at the local level from the wholesale level to the consumption/abuse level.

Dr. Cira will testify about how heroin, cocaine, and marijuana are purchased, acquired and distributed in the United States from the Cartel level to the street level. Dr. Cira will testify to the international origins of heroin and smuggling and distribution points to introduce heroin into the United States. This includes the various means that are employed to smuggle heroin into the United States and key source cities, including Chicago, IL. Various means are employed to transport distribution quantities of heroin, cocaine, and marijuana from key source cities to other cities, also referred to as consumption/abuse cities, such as St. Louis. The various means include, planes, trains, automobiles, delivery services, couriers, and commercial carriers, such as UPS, Federal Express, and the United States Postal Service.

He will testify how heroin, cocaine, and marijuana are sold on the street, its wholesale and street values at varying weight quantities and at varying levels of distribution, including the time period of 2009-2011. Dr. Cira will further explain the processes employed by narcotics traffickers to increase their profit margin, including the dilution or "cutting" process of narcotics, specifically heroin, at various levels and quantities throughout the supply chain.

Dr. Cira will explain tools and methods routinely employed by drug traffickers, including the following: (1) packaging materials, including baggies, capsules or "buttons;" (2) items used to ingest heroin, including syringes, needles, and spoons; (3) grinders for processing narcotics; (4) phones for communication; (5) cutting agents used for diluting; (6) scales; (7) "stash" houses;

(8) distribution locations; (9) drug traffickers routinely use properties associated with their illegal activities that are in the name of a third person; (10) the use of rental cars; and (11) drug traffickers routinely employ "testers," prior to purchasing bulk quantities of heroin.  A "tester" may typically be an older, experienced heroin user.

Dr. Cira will explain that more complex or sophisticated drug traffickers employ items such as a press.  A press is a valuable commodity for a drug trafficking organization to allow the organization to dilute heroin and repackage and/or brand the diluted heroin for prospective distributors.  Dr. Cira will further explain that the use of a branding instrument, such as a press plate, is also a valuable commodity utilized by more sophisticated drug trafficking organizations. Branding allows for product differentiation, which is an important and valued factor for a drug trafficking organization.  Branding may create an appearance of increased purity and quality, thereby allowing an organization to charge a higher price for the diluted product.

Dr. Cira will testify that sophisticated experienced drug trafficking organizations may also employ hidden traps in vehicles or other locations to avoid detection by law enforcement.  Hidden traps may be used to store narcotics, firearms, and/or United States currency.

Dr. Cira will explain that drug traffickers use firearms as tool of the drug trafficking trade to protect themselves, narcotics, and United States currency associated with drug trafficking, and to resolve disputes with associates or rival drug traffickers.  Drug trafficking organizations may be compartmentalized including: (1) leaders; (2) couriers; (3) stash house operators; (4) mid- and street-level distributors; and (5) enforcers.  Experienced drug traffickers may use other persons to transport or hold narcotics to insulate themselves and avoid detection by law enforcement. Drug trafficking organizations sometimes utilize "enforcers" for a myriad of reasons to further

11

drug trafficking activities, which can be violent. This may include resolving narcotics distribution related disputes and intimidating rivals.

Dr. Cira is aware of drug trafficking trends in the Eastern District of Missouri. This includes the proliferation of heroin beginning in 2008 and extending through and beyond 2011. The proliferation of heroin included an increase in the market size and share, and an increase in purity levels. In overall market terms, heroin increased, while cocaine decreased. At the same time, there was a substantial increase in heroin overdoses, including overdose deaths.

Dr. Cira has testified as an expert numerous times in federal court.

27. **CW1:**

The United States characterizes CW1 as a fact witness, but to the extent CW1 is an expert in drug trafficking, in an abundance of caution, the undersigned provide notice of certain areas of his expected testimony. The United States puts defendants on notice that CW1 may testify to any of the means and methods of drug trafficking set forth in CW1's statements, previously provided to counsel, and/or the statements proffered in the extensive previously filed pleadings and pretrial memorandum. CW1 is a convicted felon and had been a large-scale drug trafficker for most of his adult life. CW1 is an expert in the area of heroin, cocaine, and marijuana distribution. CW1 has significant experience and familiarity with the St. Louis drug trafficking market, including historical relationships with many significant organized drug traffickers who operated in the St. Louis metropolitan area. CW1 may be considered an expert by virtue of his knowledge and experience.

CW1 will provide general information as to the means employed by large scale narcotics traffickers to obtain wholesale quantities of controlled substances from source cities, including Chicago, IL. CW1 will also explain that a source of supply is also known as a "plug." An

effective source of supply or "plug" is a substantial asset at multiple levels of the drug distribution chain, allowing drug traffickers to obtain bulk quantities of narcotics, dilute the narcotics, including heroin and cocaine, and thereafter distribute the diluted product and increase their profit. CW1 will testify that it is advantageous for drug distributors to have multiple "plugs" or drug suppliers to have routine access to supplies of narcotics in order to maximize sales and profits.

CW1 will testify drug distribution and organized crime dynamics and relationships, including as they applied in this case. These dynamics have been explained in the previously filed pleadings and/or discovery materials provided to counsel. For instance, CW1 will testify that concerted actions, such as the Donald White Drug Trafficking Organization ("White DTO") taking the McGill hit at the behest of Viconto Johnson, a significant drug trafficker, strengthened with White DTO, and White's stature in numerous ways. The benefits of taking the hit enhanced the White DTO conspiracy, as explained in previous pleadings filed by the United States.

CW1 is an expert in all aspects of the distribution of illegal narcotics, including heroin, cocaine, and marijuana. CW1 is an expert in the process of obtaining bulk heroin and cocaine, diluting or "stretching" the heroin in order to double or triple the quantity of heroin, and thereby maximize profits. CW1 will also explain tools and methods routinely employed by drug traffickers, including the following: (1) packaging materials, including baggies, capsules or "buttons;" (2) items used to ingest heroin, including syringes, needles, and spoons; (3) grinders for processing narcotics; (4) phones for communication; (5) cutting agents used for diluting heroin, including lactose; (6) scales; (7) "stash" houses; (8) distribution locations; (9) the routine use of properties associated with their illegal activities that are in the name of a third person; (10) the use of rental cars; and (11) the practice of using a "tester," prior to purchasing bulk quantities of heroin.

CW1 will explain that a press, including the press seized in the present case, is a valuable commodity for a drug trafficking organization to allow the organization to dilute heroin and repackage and/or brand the diluted heroin for prospective customers/distributors.  CW1 will explain the use of the branding instruments in this case.  CW1 will further explain that he and the White DTO used the heroin press in this case a commodity to make money and strengthen and develop relationships with other drug traffickers.

CW1 will also explain that high level drug traffickers use hidden traps/compartments in vehicles or other locations to avoid detection by law enforcement.  Hidden traps may be used to store narcotics, firearms, and/or United States currency.

As detailed in the previous memorandum and discovery material, drug traffickers are frequently armed, with pistols and rifles.  CW1 will testify that firearms are a tool of the drug trade.  CW1 will testify that drug traffickers possess and use firearms to protect themselves from their rivals or anyone else who may present a threat to them.  The White DTO also used firearms to intimidate other persons and/or take controlled substances from other drug traffickers.  As detailed in previous pleadings and discovery materials, violence was an integral part of this drug trafficking conspiracy.  It was the routine practice of the drug trafficking conspiracy to use firearms to retaliate following any perceived threat or violence perpetrated upon the members of the conspiracy or their associates.

CW1 will also testify that in addition to providing United States currency to Stewart and Wilson, the conspiracy also provided them with controlled substances, primarily heroin, in relation to acts of violence perpetrated on behalf of the conspiracy.  Providing already diluted, "stretched," or "cut," controlled substances to Stewart and Wilson was a cost-effective method of

providing consideration for the commission of acts of violence and/or being available to commit acts of violence on behalf of the conspiracy.

### FORENSIC ELECTRONIC ANALYSIS

28. **Steve Taubenheim, former SLMPD Cybercrimes Investigator:**

Mr. Taubenheim is a former SLMPD officer with specialized training, knowledge, and experience in the area of electronic forensic analysis.   The Government may call Mr. Taubenheim to testify to the means and methods used to search the cellular telephones recovered from the scene of the Darrion Williams, Jr., shooting/murder scene on July 23, 2010.

29. **Bobby Baine, former SLMPD Cybercrimes Investigator:**

Mr. Baine is a former SLMPD officer with specialized training, knowledge, and experience in the area of electronic forensic analysis.   The Government may call Mr. Baine to testify to the means and methods used to search the cellular telephones recovered from the scene of the Michael McGill murder scene on March 26, 2010.

A copy of these experts' *curriculum vitae* or statement of qualifications will be provided to defense counsel forthwith.

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

 s/ Dean R. Hoag
DEAN R. HOAG, #23843MO
MICHAEL A. REILLY, #43908MO
Assistant United States Attorneys
111 South 10th Street, 20th Floor
St. Louis, MO 63102
(314) 539-6895

15

## **CERTIFICATE OF SERVICE**

      I hereby certify that on April 9, 2018, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

       /s/ Dean R. Hoag
DEAN R. HOAG, #23843MO
Assistant United States Attorney