**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**


UNITED STATES OF AMERICA,      )
                             )
                **Plaintiff,**     )
                             )
    **v.**                      ) No. 4:15-CR-441-CDP
                             )
DONALD STEWART,              )
                             )
                **Defendant.**    )


**JURY TRIAL**
**VOLUME 6**


**BEFORE THE HONORABLE CATHERINE D. PERRY**
**UNITED STATES DISTRICT JUDGE**

**MAY 2, 2018**



APPEARANCES:
For Plaintiff:     Michael A. Reilly, AUSA
                   Angie E. Danis, AUSA
                   James C. Delworth, AUSA
                   OFFICE OF U.S. ATTORNEY
                   111 South Tenth Street, 20th Floor
                   St. Louis, MO  63102

For Defendant:     Daniel Schattnik, Esq.
                   3 South Sixth Street
                   Wood River, IL  62095

                   John D. Stobbs II, Esq.
                   STOBBS LAW OFFICES
                   307 Henry Street, Suite 211
                   Alton, IL  62002

*REPORTED BY:*      *Gayle D. Madden, CSR, RDR, CRR*
                   *Official Court Reporter*
                   *United States District Court*
                   *111 South Tenth Street, Third Floor*
                   *St. Louis, MO  63102    (314) 244-7987*
        (Produced by computer-aided mechanical stenography.)

## INDEX

Objection . . . . . . . . . . . . . . . . . . . . . . Page   3

(Sealed Bench Conference excerpted.)


*Witnesses:*

**JEROME LEWIS**
    Cross-examination by Mr. Schattnik . . . . . . . . Page   7
       (continued from 5/1/2018)
    Redirect examination by Mr. Reilly . . . . . . . . Page  32

**JOSHUA PAUL MARTIN**
    Direct Examination by Ms. Danis . . . . . . . . Page  52

**CHRIS SEGER**
    Direct Examination by Mr. Delworth . . . . . . . . Page  60

**PAMELA DOMIAN**
    Direct Examination by Mr. Reilly . . . . . . . . . Page  63

**KENNETH SCOTT BINGGELI**
    Direct Examination by Mr. Reilly . . . . . . . . . Page  75

**ENRIQUE GUTIÉRREZ**
    Direct Examination by Ms. Danis . . . . . . . . Page  80

**ROB SINGH**
    Direct Examination by Mr. Reilly . . . . . . . . . Page  89
    Cross-examination by Mr. Stobbs . . . . . . . . Page 104
    Redirect Examination by Mr. Reilly . . . . . . . . Page 108

1          (Proceedings commenced at 9:04 a.m.)

2          (The following proceedings were held in open court and

3     with the Defendant present.)

4          (The following proceedings were held outside the hearing

5     and presence of the jury.)

6               THE COURT:  All right.  So I understand there's

7     something we need to discuss before we bring in the jury.

8               MR. STOBBS:  Yes.

9               THE COURT:  Yes, Mr. Stobbs.

10              MR. STOBBS:  Just it's -- very briefly, Judge, I just

11    wanted to make a record, and it will make things go quicker, I

12    think.  The Government's going to introduce Barnes Hospital

13    records for Carlos Jones, and we're going to -- we would

14    object to their being admitted.  I don't think there's any

15    hearsay exceptions.  I understand what the -- there's a case,

16    apparently, that deals with that, but I still just want to

17    have an ongoing objection regarding the records.

18              THE COURT:  All right.  And who is Carlos Jones, and

19    why are you introducing the records, just to help me?

20              MR. REILLY:  Yes, Judge.  Carlos Jones is a friend

21    and an associate of Donald Stewart, and the evidence will

22    show -- I expect Darryl Clemons to testify that after the

23    shooting --

24              THE COURT:  No.  Just tell me what the records show.

25              MR. REILLY:  The records are going to show he was

4

1    treated for burns on July 31st.

2            THE COURT:  Okay.  Okay.  All right.  I understand.

3    I remember this from the brief.

4            MR. REILLY:  He burned the van, and we say that

5    corroborates our case.

6            THE COURT:  Okay.  So tell me what the issue -- what

7    your response is to the evidentiary --

8            MR. REILLY:  My response is this couldn't be more

9    clear-cut, Your Honor.  There's two potential hearsay

10   exceptions under the Federal Rules of Evidence.  One is 804 --

11   strike that -- 803(4) Statement Made for Medical Diagnosis or

12   Treatment.  To the extent any of the records contain

13   statements of Mr. Jones, they fall within that exception, but

14   the clear-cut, kind of the blockbuster here is 803(6).  It's

15   Record of a Regularly Conducted Activity.  And we'll bring in

16   the custodian of records from Barnes-Jewish Hospital, and I

17   expect she'll lay the foundation for business records, but the

18   other thing that I will put on the record is these records are

19   kept for billing purposes because they're required for

20   regulations.  Also, the hospitals are required to keep them.

21   And also for the doctors to use and health care providers in

22   the course of treatment of specific people.

23           THE COURT:  Okay.  What all of this is -- of the

24   records is -- yeah, I mean you're right about that in terms

25   they're business records, but what about the double hearsay

5

1   issues of what he's saying?  Now, that -- that, you're saying,

2   was statements made for medical diagnosis, but what statements

3   did he make that are in those records that you're introducing?

4           MR. REILLY:  There's a couple limited statements that

5   he was burned in a barbecue fire or a propane pit fire,

6   something to that extent, and those are not the primary

7   purpose for which I'm offering them, but those are statements

8   that would be covered under that 803(4) exception.

9           And then the other thing I point out, Your Honor --

10  there's an Eighth Circuit case, *United States versus Thompson*,

11  *686 F.3d 575*.  That's *686 F.3d 575*.  Eighth Circuit, 2012.

12  That states that business records under the federal rule -- in

13  this case, the party conceded business records under the

14  Federal Rules of Evidence are not testimonial for

15  confrontation clause purposes, and this case cites other

16  cases, explaining that business records are generally

17  admissible absent confrontation because, having been created

18  for the administration of an entity's affairs and not for the

19  purposes of establishing or proving some fact at trial, they

20  are not testimonial.  So in that respect, the admissibility of

21  the records couldn't be more cut.  There's thousands of pages

22  of records, Your Honor.  We've picked 10 pages approximately

23  that really focus on the dates of Mr. Jones' admission, the

24  date and time of the admission on July 31st.

25          THE COURT:  Okay.  Okay.  Here, I've heard enough.

6

```
 1    I'm going to overrule the Defendant's objection, and those

 2    will be received into evidence.  What's the exhibit number?

 3              MR. REILLY:  108, Your Honor.

 4              THE COURT:  Okay.  I'll go ahead and receive

 5    Exhibit 108 into evidence at this time.

 6              MR. REILLY:  And may we approach the sidebar on an

 7    unrelated matter, Your Honor.  I'd --

 8              THE COURT:  You may.

 9              MR. REILLY:  And I'd ask that Deputy United States

10    Marshal, Ms. Alred, step over also.

11         (Sealed Bench Conference excerpted.)

12         (The following proceedings were held in open court

13    outside the hearing and presence of the jury.)

14              THE COURT:  All right.  Are we ready to bring in the

15    jury?

16              THE CLERK:  I'll check.

17              THE COURT:  Okay.

18              MR. REILLY:  Could we bring Mr. Lewis out before the

19    jury?

20              THE COURT:  Oh, yeah, before the jury comes in.

21         (The following proceedings were held within the hearing

22    and presence of the jury.)

23              THE COURT:  All right.  You all may be seated.

24              And, Mr. Schattnik, you may continue with your

25    cross-examination.
```

7

1      MR. SCHATTNIK:  Thank you, Your Honor.

2                    **JEROME LEWIS**,

3   HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED

4   AS FOLLOWS:

5                    CROSS-EXAMINATION

6                (continued from 5/1/2018)

7   BY MR. SCHATTNIK:

8   Q    The payment that you made with regard to Little D's

9   case -- that was -- you gave that to Don White?

10  A    Yes, sir.

11  Q    It was drugs?

12  A    Yes, sir.

13  Q    About a kilo, a kilo and a half?

14  A    A total of a kilo and a half.

15  Q    Did you give Donald White any cash?

16  A    No, sir.

17  Q    Did you give Mr. Wilson any cash?

18  A    No, sir.

19  Q    Did you give Mr. Spates any cash?

20  A    No, sir.

21  Q    Did you give my client any cash?

22  A    No, sir.

23  Q    With regard to the money that you gave to Little D at

24  Kisha's house with regard to those two keys, you indicated

25  that that money came to you from Donald White?

8

1   A    Yes, sir, I got it from Donald White.

2   Q    In terms of giving that money to Little D, was Lakisha

3   present?

4   A    I believe so.  She was in the kitchen, I believe.  Or

5   maybe she -- she might have walked out.  I know she was at the

6   house at the present time when it happened, though.

7   Q    None of that money was your money?

8   A    None of it.

9   Q    In terms of the money that you got from Don White, did

10  you show that to Kisha before the deal?

11  A    I don't believe I did.

12  Q    Would Kisha have counted that money?

13  A    No, sir.

14  Q    In terms of the dollar amount, could you be wrong?

15  Fifteen or 30 thousand?

16  A    No, sir.

17  Q    In terms of something Lakisha told us, have you ever had

18  your hands tested for gunshot residue?

19  A    No, sir.

20  Q    In terms of -- did you ever make any statement to her

21  that you had your hands tested for gunshot residue with regard

22  to any event?

23  A    No, sir.

24  Q    So I believe when we were talking yesterday -- leading up

25  to the break, we were talking about different relationships

1   that people in the drug business had; is that right?

2   A    Correct.

3   Q    And you were talking about that sometimes people are

4   upstream from you, sometimes people are downstream from you,

5   and sometimes you do some deals with people on an even keel

6   with you; right?

7   A    Correct.

8   Q    And one of the people that you might have participated on

9   an even keel in terms of what we've talked about was Little D?

10  A    Correct.

11  Q    You've indicated that your relationship with Donald White

12  was like a brotherly love.  That wasn't quite the relationship

13  that you had with Little D, was it?

14  A    The same.

15  Q    You did have a relationship --

16  A    I looked at him like a little brother as well.

17  Q    He was like your little brother?

18  A    Yeah.

19  Q    That's how you felt about Little D?

20  A    I mean at the time we was -- we was close.

21  Q    That's how you felt on the day he was killed?

22  A    I mean I didn't know he was going to get killed.

23  Q    Oh, so on the day that he got killed, your feeling, your

24  vibe towards Little D was brotherly love?

25  A    Yeah.

Jerome Lewis Cross-examination                          Volume 6

10

1    Q      He was like a little brother to you?

2    A      Yeah.

3    Q      So that anything you're going to do to him is what you're

4    doing to your little brother; right?

5    A      I mean not so much of that, but, yeah, I did it.

6    Q      Okay.  Isn't it fair to say that nothing happens to

7    Little D except for your greed?

8    A      Say that again.

9    Q      Nothing happens to Little D that day but for your greed?

10   A      Yeah.  I mean it was for me just to set up a robbery and

11   get what I felt that was owed to me.  Nothing else supposed to

12   happen.

13   Q      In terms of the homicide with regard to Little D,

14   basically, you set this up?

15   A      I did.

16   Q      You set this up as a murder?

17   A      Not a murder.  It was supposed to have been a robbery.

18   Q      This was all your deal; right?  You're the one that

19   wanted this done; right?

20   A      A robbery.  Not a murder.

21   Q      The events with regard to Little D -- this is something

22   that you set up; right?

23   A      I did.

24   Q      And you were having problems with Little D, not quite

25   brotherly love feelings, weren't you?

Jerome Lewis Cross-examination                          Volume 6

11

1    A    I mean it was still the same, brotherly love.  Yes, just

2    misunderstanding.  I wanted something that he owed me.

3    Q    Misunderstanding.  Basically, he talked you into being

4    the moneyman for a deal that he had set up; right?

5    A    Who said -- I mean who told me to be the money man?

6    Q    He talked you into coming up with 20 grand of your money

7    with regard to the deal where you guys were going to get those

8    20 keys; right?

9    A    Correct.  It was a total of 40,000.

10   Q    Right, but in terms of what came out of your pocket --

11   A    Was 20.

12   Q    -- was $20,000?

13   A    Correct.

14   Q    And that was something that Little D basically didn't

15   have the money to swing the deal?

16   A    Correct.

17   Q    And you did?

18   A    Correct.

19   Q    So, basically, he needed your money to do the deal?

20   A    Correct.

21   Q    He needed you to find additional people to come up with

22   money for the deal?

23   A    Correct.

24   Q    And so you contacted your -- your friends over in

25   East St. Louis?

1    A    My friend from St. Louis contacted his people in

2    East St. Louis.

3    Q    All right.  And so basically --

4    A    Had been looking for something.

5    Q    -- the people from East St. Louis put up another 20?

6    A    Correct.

7    Q    And, basically, they put that up on your word, not

8    Little D's word; right?

9    A    On my word.

10   Q    You're the guy that they trusted?

11   A    Correct.

12   Q    So when that money gets ripped off, it's 20 out of your

13   pocket and 20 that your friends have been ripped off because

14   of your word?

15   A    Correct.  I'm responsible.

16   Q    And you talked to -- and the friends over in

17   East St. Louis, that was Marquis Calloway?

18   A    Marquis Calloway is from St. Louis.  His cousin was from

19   East St. Louis.

20   Q    All right.  So you call Marquis; Marquis calls his

21   cousins; they come up with the dough?

22   A    Correct.

23   Q    All right.  So, basically, you go to this deal?

24   A    Correct.

25   Q    You give these guys $40,000?

1   A    I give Little D $40,000.

2   Q    Pardon?

3   A    Little D, $40,000.

4   Q    All right.  But the deal takes place, and you guys get a

5   duffel bag; is that right?

6   A    Correct.

7   Q    Duffel bag supposed to have keys of cocaine in it?

8   A    Correct.

9   Q    And, basically, all it turns out is you bought some

10  pretty expensive drywall; right?

11  A    Drywall.

12  Q    As a result of that, is it fair to say that you and

13  Little D had a falling out?

14  A    Correct.

15  Q    You kept demanding your money back?

16  A    Correct.

17  Q    Little D kept saying no?

18  A    Wasn't so much a no.  He just kept prolonging me, like

19  "I'm going to get it to you.  I'm going to get it to you."

20  Q    So you kept asking for the money, but you never got it?

21  A    Correct.

22  Q    Time after time, again, you would ask him for the money;

23  right?

24  A    Correct.

25  Q    So he used your money in a scam.  He didn't do anything

Jerome Lewis Cross-examination                              Volume 6

14

1   to get your money back that you know of, did he?

2   A    No.

3   Q    Everybody knows that you've been ripped off; right?

4   A    I mean the people that was there knew what happened; he

5   knew what happened.

6   Q    So tell me; if you're a drug dealer and you get ripped

7   off and nothing happens to the person that ripped you off, is

8   that good for business or bad for business?

9   A    I mean it's bad for business.

10  Q    And why is that?

11  A    Because nine times out of 10, somebody else in the street

12  is going to try to do the same thing, take you as being a

13  weakling.

14  Q    It's going to be a line of people ripping you off if you

15  don't do something; right?

16  A    I ain't going to say a line of people.  It would depend

17  on who you deal with.

18  Q    It's kind of the same thing in prisons too.  If somebody

19  takes something of yours, if you don't do something,

20  everybody's going to take something of yours; right?

21  A    Somebody will try sooner or later.

22  Q    Okay.  So you decide to kill Little D because of this

23  money; right?

24  A    I didn't decide to kill Little D.

25  Q    So you talked to your buddy Don White?

Jerome Lewis Cross-examination                                    Volume 6

15

1    A    Correct.

2    Q    Don White is the guy that you do a lot of business with?

3    A    Correct.

4    Q    Basically, you sell him marijuana?

5    A    Correct.

6    Q    Sometimes, he sells you marijuana?

7    A    No, he ain't never sold me no marijuana.

8    Q    So he never has given you any marijuana?

9    A    I mean the one time that he did the robbery -- that's the

10   only time he had marijuana, and he asked me to help him get

11   rid of it.

12   Q    All right.  You've supplied him with cocaine?

13   A    Correct.

14   Q    Has he supplied you with cocaine?

15   A    Yeah.  One time.  The same time he gave me the weed.

16   Q    Just that one time?  Have you ever supplied him with

17   heroin?

18   A    One time.

19   Q    In terms of Mr. Clemons, would you provide him with

20   heroin?

21   A    No, I ain't never gave Clemons no heroin.

22   Q    Not even any user amounts?

23   A    No.  I mean maybe Donald White gave it to him after I

24   had -- it was one time when I was at Donald White house and I

25   gave him some and he was there and he was present.  You know

1   what I mean?  I don't know if he was there to do whatever or

2   whatever, but I know he got high.

3   Q    All right.  So in terms of the dealings with Don White,

4   was Don White with Mr. Clemons often?

5   A    Yeah, majority of the time.

6   Q    So, basically, that was -- was that his sidekick, his

7   partner?

8   A    Yeah, I would say so.

9   Q    How would you describe their relationship?

10  A    I mean they was close.

11  Q    Okay.  And so, basically, most of the time when you saw

12  Donald White, you saw Clemons?

13  A    I did.

14  Q    So, basically, in setting up this deal with Little D, you

15  set up a deal to make him feel comfortable, don't you?

16  A    Correct.

17  Q    You invite him over to Lakisha's house?

18  A    Correct.

19  Q    He'd never been to Lakisha's house before, had he?

20  A    No.  That was his first time.

21  Q    He didn't even know where she lived, did he?

22  A    No, sir.

23  Q    So you bring him over there, and it's a nice, safe

24  environment?

25  A    Correct.

Jerome Lewis Cross-examination                                    Volume 6

17

1    Q      Just you and a gal?

2    A      Correct.  I mean her cousin was at the house too and my

3    little daughter, my baby.

4    Q      Okay.  The baby was in the house too?

5    A      Yes, sir.

6    Q      The baby was in the house when you did this drug deal?

7    A      No.  I mean she was up -- yeah, she was upstairs in Kisha

8    room.

9    Q      Just a nice, safe environment to do a drug deal?

10   A      I mean I felt that way at the time, yeah, like it was

11   safe for me to do a transaction inside of her house.

12   Q      And, basically, so you bring him over to the house where

13   your girl is there, where the baby is there, so that basically

14   sends a signal this is a safe place; right?

15   A      I mean, for me, yeah, at the time, it's safe.

16   Q      Well, for him too?  I mean if you're exposing --

17   A      Yeah.

18   Q      If you're exposing your baby and if you're exposing your

19   woman there, he knows nothing bad's going to happen there;

20   right?

21   A      Correct.  And Kisha was not my woman.  We don't have a

22   relationship like that.  That was a friend of mine.

23   Q      So she was just an acquaintance of yours?

24   A      That was it.  A sidekick.  I had a woman at the time as

25   well.

Jerome Lewis Cross-examination                    Volume 6

18

1  Q    Okay.  So, basically, you give him money for two kilos?

2  A    Correct.

3  Q    You take possession of the two kilos?

4  A    I do.

5  Q    So you've got that already on the side.  And then that is

6  when you took steps to put your plan into effect to kill

7  Darrion Williams?

8  A    It wasn't to kill.  It was to set up the robbery for the

9  other.

10 Q    Mr. Williams was the guy that had ripped you off?

11 A    Correct.

12 Q    Was a guy that up to that point in time you'd done

13 nothing about it?

14 A    Correct.

15 Q    He was a guy that wasn't doing anything to get your money

16 back?

17 A    Correct.

18 Q    And it was clear to you that you weren't going to get

19 your money back?

20 A    I ain't going to say I wasn't going to get it back.  I

21 mean at the time I felt like he hadn't did it.  He buying cars

22 and everything.  So, therefore, I felt like "You're doing

23 other things instead of getting my money."

24 Q    He's got money.  He's spending it.  He's got cars.

25 A    Correct.

Jerome Lewis Cross-examination                          Volume 6

19

1   Q    And this is all with your money?  That should be yours?

2   A    I mean -- correct.  I mean pay my money.  That's how I

3   felt at the time.

4   Q    Because without your money, there's not a profit; there's

5   a loss?

6   A    I mean I took a loss.  It was a loss from the beginning

7   anyway once he got ripped off, so . . .

8   Q    But he's the guy that owes you the money then; right?

9   A    Correct.

10  Q    He's the guy responsible?  He's the guy not giving you

11  your money back?

12  A    Correct.

13  Q    So, basically, you talked to your buddy Don White?

14  A    Correct.

15  Q    You get a bunch of guys together?

16  A    Me and Don White was one-on-one.

17  Q    Just you and White, Don White.  All right.  So was

18  Mr. Clemons a part of any of those plans?

19  A    No, sir.  He wasn't -- he wasn't even around,

20  point-blank, period, when I talked to Donald White.

21  Q    All right.  Wasn't around?  Not in the picture?

22  A    No, sir.

23  Q    So in terms of the car that Mr. Wilson got, was that part

24  of the payment for the Little D killing?

25  A    No, sir.

Case: 4:15-cr-00441-CDP   Doc. #:  266   Filed: 11/27/18   Page: 20 of 114 PageID #: 1962
Jerome Lewis Cross-examination                          Volume 6

                                                                      20

1    Q    That's something completely separate?

2    A    Totally different.

3    Q    So in terms of -- in terms of Terrance Wilson, he got no

4    cash from you; the car wasn't related to the event; and nobody

5    else got any cash from you; right?

6    A    Correct.

7    Q    And so, basically, you invite Little D to the scene of

8    the event; right?

9    A    Correct.

10   Q    Isn't it true that you gave the signal to kill Little D?

11   A    Never gave a signal.

12   Q    So in terms --

13   A    We never even said -- talked about none of that.  The

14   whole time I was around them, we never talked about nothing.

15   None of them guys.  Don White gave them orders or whatever,

16   and that's supposed to have been at the robbery.

17   Q    So you didn't talk to anybody at all about what was going

18   down except Donald White?

19   A    That's it.

20   Q    And then after Little D is killed, killed not at your

21   insistence, but you decide that it's better to leave town?

22   A    Yeah, sometime afterwards.

23   Q    Go to Arizona first?

24   A    Atlanta.

25   Q    So no side trip to Arizona?

```
 1   A    Yeah, I went to Arizona before --

 2   Q    All right.

 3   A    -- one time on a weekend.

 4   Q    Straight to Atlanta?

 5   A    That's where I moved to.

 6   Q    Okay.  So after the shooting, how do people disperse?

 7   A    I mean it felt like I was the one that had got Little D

 8   killed.

 9   Q    Pardon?

10   A    You say, oh, after the shooting, how did everybody

11   disperse?

12   Q    Who went where?  How?  Yeah.

13   A    O.G. had went back through the side of the gate.

14   Terrance Wilson and Little C got in a car heading east towards

15   Kingshighway.  I took my mother -- hopped in my mother

16   Navigator and went the opposite way down the alley.

17   Q    So in terms of the old man, what gate did he go?

18   A    Through the same gate that he squeezed through on the

19   side of his house.

20   Q    The same gate?

21   A    Yes, sir.

22   Q    Was that on the back of the house?

23   A    It's on side of the house.  On the side, back of the

24   house.

25   Q    So we've got this on the ELMO, and so we've got the
```

22

1  house, and there's the front, and there's the back.  So in

2  terms of where the shooting took place, kind of give us an

3  idea; take a look at the ELMO and point it out.

4  A    Where the house set, it's a gate in between the

5  residence.

6  Q    So is there -- are you talking about a gate back here?

7  A    I mean it's -- it was on the side of the house.  There

8  was a trash can back there, and I was parked on like some

9  grass, and it was like a concrete slab.  So with the picture,

10  I can't really zoom in and see exactly in between the houses,

11  but it's a gate, an iron gate, that was in between the houses.

12  Q    And is it the iron gates that are in the front there?

13  A    No.  It's on the side, like going towards the -- like

14  right on the side, in between like it's -- I want to say it's

15  an apartment that sit on the side of wherever the residence

16  was, like a four-family flat because some kids was in the back

17  window of the residence or the house.

18  Q    So was there any gate at the back edge of the yard?

19  A    No, sir.

20  Q    So you just walk through and there's no gate?  You just

21  walk into this yard?

22  A    Yeah, all of that back there was like open when we was

23  back there.

24  Q    So where's the gate that we're talking about?  Is it

25  here?  Is it there?

Jerome Lewis Cross-examination                          Volume 6

                                                                    23

1   A    It's in between his residence and the people that stay

2   next door to him, the building that sit next on the --

3   Q    So is there a gate here?

4   A    -- left-hand side of his house.

5   Q    So is the gate here or here?

6   A    Wherever his residence is, it's right in between the two.

7   Q    Well, this is the residence that's been marked by the

8   Government.  So, basically, would the gate have been on this

9   side -- we'll call this A -- or would the gate have been B?

10  A    B.

11  Q    So there's a gate.  Is it right here?

12  A    In between wherever the house at.

13  Q    Right there.  So is that between these two houses?

14  A    That's where it would be if that was the residence.

15  Q    So there's a gate right here?

16  A    On the side, like towards in the middle between the front

17  and the back.

18  Q    Well, this is the side, so -- so is it -- is it somewhere

19  between here?  Is it like at this end?  In the middle?

20  A    It would be in the middle.  Just say in the middle

21  towards the front.

22  Q    So it'd be on this side, in the middle, right about

23  there?

24  A    Come back some.

25  Q    Right about there?

Jerome Lewis Cross-examination                              Volume 6

                                                                    24

1   A    Come back some.

2   Q    This way?

3   A    Like about -- up a little bit.  Like right there.

4   Q    Right there?

5   A    Right there.  It's a gate you can see clear as day right

6   there, wherever the residence at.

7   Q    All right.  And in terms of the gate that's on this side

8   then, when you go through this gate, then where do you go?

9   A    Towards Northland.  Towards the street.

10  Q    You go to the street?

11  A    Or either you can -- it depends on which way you coming

12  from.  You go towards the street of Northland or come back

13  towards the alley.

14  Q    So is there a second gate here?

15  A    No, I wouldn't say there was a gate right there.

16  Q    Pardon?

17  A    It's like a -- it's like a border separating.  It was

18  like an iron gate, I mean an iron fence, and it separate the

19  two houses, and it's a little gate hole on the side.

20  Q    On this side?

21  A    That's the residence that's on the side.

22  Q    Okay.  And so in terms of where you went, did you go this

23  way?

24  A    Yes, sir.

25  Q    And in terms of where the other two guys went in the car,

25

1    did they travel in the same direction you did?

2    A    No, sir.  They went the opposite way, east towards --

3    Q    So they went that way?

4    A    Towards Kingshighway, yes, sir.

5    Q    And so when you went down to the end here, how far did

6    you go?

7    A    I went all the way down to the end of the alley and made

8    a left onto Union Boulevard.

9    Q    And so that would be a left turn from there?

10   A    Straight down the alley and made a left onto Union

11   Boulevard.

12   Q    To get onto the street?

13   A    To get onto where?

14   Q    To get onto this street?  If you're making -- going here

15   and you're making a left --

16   A    Yeah.  If you go down the alley, you'll make a left going

17   back towards Northland.

18   Q    And that's the way you went?

19   A    Yes, sir.

20   Q    And then when you got to Northland, which way did you go?

21   A    I circled back around.

22   Q    So when you said you circled back around, so you're at

23   Northland.  So do you go this way on Northland, or do you go

24   the other way on Northland?

25   A    I went that way on Northland -- the first direction --

Jerome Lewis Cross-examination                          Volume 6

26

1    towards east Kingshighway.

2    Q    This way?

3    A    Right.

4    Q    So you come down the alley, you come here, and you go

5    back that way, past the house?

6    A    Correct.  Why I went -- why I went that way -- because I

7    was doubling back to try to get back to see if he was all

8    right, and by the time I was going through the alley, I heard

9    the police sirens, and I had dope on me, and I kept going.

10   Q    Okay.  So, basically, this case we're here today -- this

11   is kind of a golden opportunity for you, isn't it?

12   A    It's not a golden opportunity, but it's an opportunity

13   for me to get a time cut if --

14   Q    So you're jammed up on the Texas drug case?

15   A    Correct.

16   Q    Government had you cold on that one; right?

17   A    Correct.

18   Q    You're sending out coke through the mail?

19   A    Yes, sir.  I'm receiving coke through the mail.

20   Q    Pretty sure way to get caught; right?  You got caught?

21   A    I got caught.

22   Q    No way out?

23   A    No, sir.  I mean I owned up to it.

24   Q    Entered a plea of guilty because they had you; right?

25   A    Yeah.  I'm guilty for it.

Jerome Lewis Cross-examination                              Volume 6

27

1   Q    Okay.  In terms of the Darrion Williams case, though, you

2   knew it was only a matter of time before that would catch up

3   with you too, didn't you?

4   A    I mean I can't say so.  I mean, but what's in the dark

5   will surely come to the light sooner or later.

6   Q    Well, you knew right off the bat that the word on the

7   street was that you'd killed him; right?

8   A    Who?

9   Q    You knew right off the bat that his dad was telling

10  everybody that you did it; right?

11  A    I mean I know his dad.  I never knew his dad said nothing

12  about it.

13  Q    So you didn't want to go talk to his dad?

14  A    I mean at the time because I felt like I owed his father

15  an explanation of anything about what had happened.  And his

16  family, his wife and his daughter.

17  Q    So did you want to -- did you want to -- did you want to

18  go talk to his dad?

19  A    Yeah, I wanted to talk to his dad.

20  Q    Lakisha talk you out of that?

21  A    No.  She never -- I never talked to her about talking to

22  his dad.

23  Q    And you knew that there would be a record of your phone

24  calls, didn't you?

25  A    Correct.

1   Q    Your phone calls with Little D; right?

2   A    Correct.

3   Q    The phone calls that would lead right up to the time that

4   he got shot; right?

5   A    Correct.

6   Q    You knew that the evidence against you was in Little D's

7   phone; right?

8   A    I mean, yeah, me calling him.

9   Q    All right.  And that's the phone he died holding, wasn't

10  it?

11  A    I don't know if he died holding it because I didn't see

12  him like -- like that.

13  Q    That was the phone that was in his left hand as he was

14  dead on the ground?

15  A    I mean I didn't see his body like that.  He walked off to

16  go use the bathroom.

17  Q    You knew that his phone would have your phone number in

18  it?

19  A    Correct.

20  Q    You'd be identified in the contacts; right?

21  A    Correct.

22  Q    You knew that the number -- what is it -- 636-697 -- was

23  it 6200?

24  A    I mean at the time, whatever the number was that's on the

25  paper, that's the number.

1  Q    And that's the number that the Government discussed with

2  you, right, whatever it was?

3  A    Sure.

4  Q    And, basically, in terms of the time records of it, you

5  knew that the phone records would show that in the hour

6  leading up to Little D's death, that there were many phone

7  calls between you and him; right?

8  A    Correct.

9  Q    There's one from 6:03?

10 A    Whatever number it say my name at.

11 Q    All right.  So we've got 6:03, 6:12, 6:20, 6:59, three

12 calls at 7:06, a call at 7:07, a call at 7:08, a longer call

13 at 7:11, and then at 7:14, he's shot; right?

14 A    Correct.

15 Q    You've not been charged with Little D's murder?

16 A    Correct.

17 Q    You knew, though, that when you left that scene, that

18 there was that possibility that you might be; correct?

19 A    Yeah.

20 Q    Whether you set it up for out of just the goodness of

21 brotherly love or to kill him, still, you would be guilty of

22 murder for setting up a deal where a guy died; right?

23 A    Correct.

24 Q    You knew that; right?

25 A    I mean it was supposed to have been a robbery, not a

30

1   murder.

2   Q    And you know that a murder would at least get you a life

3   sentence; right?

4   A    I mean, yeah, if you're convicted of a murder.

5   Q    And you knew that a murder could possibly expose you to

6   the death penalty too; right?

7   A    That's correct.

8   Q    A murder conviction would guarantee that you would spend

9   the rest of your life in prison; right?

10          MR. REILLY:  At this point, I'm going to object,

11   Judge.  He's asking the witness to speculate.

12          THE COURT:  Sustained.

13   Q    (By Mr. Schattnik) And all of a sudden, you get a golden

14   opportunity; right?

15   A    If you consider that being a golden opportunity.

16   Q    You're presented with an opportunity to avoid being

17   charged with a murder; right?

18   A    Correct.

19   Q    The murder that you set up; right?

20   A    Supposed to have been a robbery.

21   Q    The murder that you did; right?

22   A    I didn't do it.  I never had a gun.  I didn't pull the

23   trigger.

24   Q    The murder that you're responsible for; right?

25   A    I mean I played a role in it, so, yeah, I'm part

Jerome Lewis Cross-examination                                Volume 6

31

1   responsible for it.

2   Q    Plus you get an extra added bonus.  Not only do you dodge

3   murder, but you're looking for help in the drug case that

4   you've got; right?

5   A    Correct.

6   Q    A drug case where the guideline range is around 24 years,

7   a little more, a little less; right?

8   A    Correct.  Nineteen and a half years to 24 years.

9   Q    The drug case where your sentencing has been pushed back

10  about three years now since your plea?

11  A    Correct.

12  Q    So you can get a deal and a benefit, basically, but we

13  don't know what that is; right?

14  A    Correct.  I mean I wasn't promised nothing, so . . .

15  Q    But you're counting on something, aren't you?

16  A    I mean I'm looking forward to it, but I'm like -- I

17  wasn't promised nothing, though.

18  Q    But you're looking forward to it; right?

19  A    Correct.

20  Q    You're counting on it; right?

21  A    I mean I'm praying for it.

22  Q    These are benefits that you want; right?

23  A    Correct.

24  Q    These are benefits that you need for your life; right?

25  A    Correct.

32

1   Q    And that's why you're here?

2   A    Correct.

3   Q    That's profit for you?

4   A    What you consider that being?

5           MR. SCHATTNIK:  No further questions, Your Honor.

6           THE COURT:  Redirect.

7           MR. REILLY:  Thank you, Judge.

8                      REDIRECT EXAMINATION

9   BY MR. REILLY:

10  Q    How was it that you got directed to Northland on

11  October 23rd of -- strike that -- on July 23rd, 2010?

12  A    Terrance Wilson told me to follow him, and I followed him

13  in my vehicle.

14  Q    And who was with Terrance Wilson when you followed

15  Mr. Wilson to Northland?

16  A    O.G.

17  Q    O.G.  You're referring to the Defendant; is that correct?

18  A    Correct.

19  Q    And then once you arrived at the residence, did you tell

20  us yesterday you were inside for a period of time?

21  A    Correct.

22  Q    And how was it -- you parked your vehicle in the front

23  initially; is that correct?

24  A    I did.  Correct.

25  Q    Who -- who directed you to park your vehicle in the back?

1   A    O.G. told me where to pull it when I followed them.  They

2   said follow them.  After we had took a walk where we wanted

3   him to pull up at at first and then once we went back through

4   the gate, all of us went through the gate side by side when we

5   went back towards our vehicle, and we pulled the vehicles back

6   in the back.

7   Q    And who led you on the walk?

8   A    O.G. did.

9   Q    Who led you -- you said you looked at a location on

10  Maffitt; is that correct?

11  A    O.G. did.

12  Q    Who led you to Maffitt?

13  A    O.G.

14  Q    Who decided not to use Maffitt?

15  A    O.G.

16  Q    And was it at that point you were directed to park your

17  car in the area?

18  A    In behind the house.

19  Q    Now, you don't deny setting this up as a robbery; is that

20  correct?

21  A    I don't deny none of it.

22  Q    And you knew guns would be used in the robbery?  Fair to

23  say?

24  A    Correct.

25  Q    At least a gun?

 1   A     Correct.

 2   Q     And then you don't -- you don't deny that you got two

 3   kilograms of cocaine from Mr. Williams before the deal?

 4   A     Correct.

 5   Q     You don't deny that you -- you lured Mr. Williams over

 6   there to get the third kilogram; is that correct?

 7   A     I did.

 8   Q     And you don't deny directing him to the spot in the alley

 9   where this happened?

10   A     I don't deny it.

11   Q     I'm going to just quickly direct your attention to 49A.

12           THE COURT:  49A; right?

13           MR. REILLY:  Yes, Your Honor.  I can use it on the

14   ELMO if I have to.

15           THE COURT:  Okay.  We've got it.

16   Q   (By Mr. Reilly) And once -- once Mr. Williams was shot --

17   I haven't showed you this picture before; is that correct?

18   A     I seen it somewhere.

19   Q     You've seen it before at some point?  Okay.  Once

20   Mr. Williams was shot, did you see him move off the ground

21   after he was shot?

22   A     No, sir.

23   Q     And who shot him at that point?  Who shot him first?

24   A     O.G. started shooting.  Then Terrance Wilson and Spates

25   ran up over him.

1    Q    And did you say that Mr. Williams fell after O.G. started

2    shooting?

3    A    Correct.  And he said, "Ah, bro."

4    Q    And does this depict -- is this consistent with the area

5    where -- where Mr. Williams fell?

6    A    Correct.

7    Q    After -- after the Defendant here shot him?

8    A    Correct.

9    Q    Did you ever see him move once he fell?

10   A    No, sir.

11   Q    Okay.  So there's no reason to dispute that this is where

12   his body was located; is that correct?

13   A    I guess, yes, sir.

14   Q    Thank you.  You can take that picture down.  So -- and

15   you don't deny directing Mr. Williams to that spot in the

16   alley; is that fair to say?

17   A    I don't.

18   Q    You don't deny parking your Navigator where Mr. Stewart

19   over here directed you to; is that correct?

20   A    No, sir.

21   Q    And when I said Navigator, that was your mother's

22   vehicle; is that correct?

23   A    My mother's.  Registered to my mother and everything.

24   Q    Registered to your mother?

25   A    Correct.

                                                                    36

1    Q    So to do this, what you tell us is a robbery, you -- you

2    used your car registered to your mother; is that correct?

3    A    Correct.

4    Q    And you don't deny taking that third kilo and splitting

5    the three kilograms of cocaine with Donald White?

6    A    I don't deny it.

7    Q    And in terms of what Mr. White -- when you split the

8    cocaine with Mr. White, do you recall if anybody else was

9    present?

10   A    No, sir, there wasn't nobody else present when I split it

11   with him.

12   Q    What Mr. White told his people he received for this

13   robbery -- do you know what he received or what he told his

14   people?  Do you have any idea what he told --

15   A    I don't know what --

16   Q    -- his people he received?

17   A    I wasn't present when he talked to them, period.

18   Q    Okay.  And then after these events occurred -- make no

19   bones about it -- you continued to sell drugs; right?

20   A    Yes, sir.

21   Q    And you developed this big source out of -- out of Texas,

22   down by the Mexican border, that was sending you large

23   quantities of cocaine?

24   A    I did.

25   Q    And you didn't stop until you got arrested when you got

1   charged in your pending case; is that correct?

2   A    Correct.

3   Q    Now I'm going to take you to -- Mr. Schattnik asked you

4   some questions about this polygraph, and if you don't mind,

5   I'm going to reference your exhibits.  Could I have the ELMO

6   please?  I'm going to take you to the Defendant's Exhibit 7,

7   and in this polygraph, you were asked some questions about

8   whether you knew that Darrion Williams was going to be shot

9   before he arrived; is that correct?

10  A    Correct.

11  Q    And then during the course of the examination -- I'm

12  going to direct your attention to the last -- one of the last

13  paragraphs.  Can you see that?

14  A    Yes, sir.

15  Q    You had a chance to talk with the examiner at the

16  conclusion of the paragraph; is that correct?

17  A    Yes, sir.

18  Q    And you've had a chance to review this; is that correct?

19  A    Correct.

20  Q    Now -- and it says -- and this -- by the way, the date on

21  this is February 18th of 2015; is that correct?

22  A    Correct.

23  Q    And the polygraph -- it refers to a polygraph exam on

24  February 17th of 2015; is that -- does that sound about right?

25  A    Yes, it does.

1   Q    That was some time ago; correct?

2   A    Yes, sir.

3   Q    And I'm going to ask you is this information -- I'll read

4   the sentence to you and ask you if this is generally correct

5   as to what you said after the events, that "During the

6   post-test conference, Mr. Lewis acknowledged he did have

7   information about an intent to shoot Mr. Williams and he had

8   learned that information after he arrived at the scene and

9   before Mr. Williams' arrival."  Is that consistent with what

10  you told the examiner?

11  A    Yes, sir.

12  Q    "Mr. Lewis said one of the principals involved, who he

13  identified as the initial shooter, the old man, had made

14  comments indicating it was his intent to shoot and rob

15  Mr. Williams upon his arrival."  Is that consistent with the

16  information you gave the polygraph examiner?

17  A    Correct.

18  Q    And what -- do you recall the statement that that was a

19  reference to?

20  A    Like he made a statement as far as like, "I'll rob my own

21  mother.  I'll rob and shoot my own mother."

22  Q    "And then he said he was anxious about the entire

23  situation and said he feared for his own personal safety after

24  hearing those comments from the old man."

25  A    Correct.  It's like if I leave then, what's the -- I mean

1    I try to leave, what's the chances of them doing something to

2    me.

3    Q    Okay.  And then it says, "He said he witnessed the old

4    man shoot Mr. Williams several times with a handgun."

5    A    Correct.

6    Q    "And that the other individuals who were present ran to

7    where Williams lay," and then it continues on; is that

8    correct?

9    A    Correct.

10   Q    That was the statement that you made on or about

11   February 17th of 2015?

12   A    Correct.  Due to the polygraph felt like I was holding

13   something back.

14   Q    Okay.  Prior to that time, you'd acknowledged that there

15   was clearly going to be a robbery?  That was your position?

16   A    Correct.

17   Q    And then -- and then the United States Attorney's Office

18   asked that you take a polygraph?

19   A    Correct.

20   Q    I'm going to direct you to page 11 of your Plea

21   Agreement.  Do you recall this?  It's Defendant's Exhibit #1.

22        Is that 1, Dan?

23            THE COURT:  It's 2.  The Plea Agreement is Exhibit 2.

24            MR. REILLY:  I'm sorry.  Thank you.

25   Q    (By Mr. Reilly) I'm going to direct you to #2.  As part

1    of your agreement with the Government, there were certain

2    agreements on the sentencing guidelines; is that correct?

3    A    Correct.

4    Q    And I'll direct you to page -- page 11 or page 10.

5    There's some recommendations that pertain to the United States

6    sentencing guidelines?

7    A    Correct.

8    Q    One of those recommendations related to some adjustments

9    for obstruction of justice.

10   A    Right.

11   Q    "The parties agree that a two-level increase is

12   applicable pursuant to § 3C1.1 because the Defendant willfully

13   obstructed or impeded or attempted to obstruct or impede the

14   administration of justice with respect to the investigation,

15   prosecution, or sentencing of the instant offense of

16   conviction."  That was your drug trafficking case; is that

17   correct?

18   A    Correct.

19   Q    For information that you provided in your initial proffer

20   or your first or second proffers, you gave some information

21   about your drug case that wasn't true; right?

22   A    About -- about me receiving counterfeit money in the

23   beginning is what I was saying yesterday.

24   Q    And you didn't tell the truth?

25   A    Correct.

41

1   Q    "And the obstructive conduct related to the Defendant's

2   offense of conviction and any relevant conduct."  It related

3   to the case you were charged with; is that correct?

4   A    Correct, as I said yesterday.

5   Q    And this was our agreement.  You were aware the United

6   States insisted that you take an extra two-level adjustment

7   for not giving truthful information initially in this case;

8   isn't that correct?

9   A    Correct.

10  Q    And you agreed to that?

11  A    Correct.

12  Q    And as we discussed yesterday, that caused an increase in

13  your guideline offense level?

14  A    Correct.

15  Q    You don't deny that you possessed firearms, carried

16  firearms, and that was routine for you; is that correct?

17  A    Correct.

18  Q    And you told Mr. Schattnik yesterday, when he was asking

19  you questions, that you -- did you say you had a converted

20  firearm, something that fired like an automatic weapon?

21  A    Yes, sir.

22  Q    And it had an extended magazine on it?

23  A    Correct.

24  Q    Mr. Schattnik asked you some questions yesterday relative

25  to the murder of Ronald James?

Jerome Lewis Redirect Examination                            Volume 6

42

1    A     Right.

2    Q     Were you residing at Dismas House in the time frame when

3    Ronald James was murdered?

4    A     No.  I was in the Dismas House, but I wasn't present

5    inside the Dismas House when --

6    Q     So you were not present at the exact time that Mr. James

7    was murdered?

8    A     Correct.

9    Q     And while you were residing there, is it fair to say that

10   when you're at Dismas House you can leave for a variety of

11   reasons?

12   A     Correct.

13   Q     Does that include spending the night somewhere else with

14   the permission of the authorities at Dismas House?

15   A     Correct.  It's called a home pass.

16   Q     And were you out on a home pass the night that -- that --

17   or did you leave at some point the night before Mr. James was

18   killed?

19   A     Yes, sir.

20   Q     And so you actually weren't present; you didn't see the

21   events; you were not at Dismas House the morning of the

22   shooting on or about July 28th?

23   A     I wasn't present.

24   Q     All right.  Were you discharged from Dismas House shortly

25   after the shooting?

43

1    A    Correct.  Yeah, I was.

2    Q    During this general time period, were you in

3    communication with Donald White in relation to the

4    relationship that you've described previously to the jury?

5    You had a preexisting drug trafficking relationship with

6    Donald White; is that correct?

7    A    Correct.

8    Q    So were you in touch with him off and on during the

9    period in which you were at Dismas House?

10   A    Correct.  I was.

11   Q    Are you aware of whether there existed any -- any issues

12   between White and Ronald James?

13   A    Yeah, due to the situation with him and James.  I mean

14   Blue.

15   Q    Did White ever tell you why he had an issue with James?

16   A    Because he felt --

17        MR. SCHATTNIK:  Objection, Your Honor.  802.

18        THE COURT:  Yeah.  Sustained.  I don't see any

19   furtherance.

20        MR. REILLY:  Okay.  Can I ask this?

21   Q    (By Mr. Reilly) You were aware from talking with White

22   that he had an issue with Ronald James?

23   A    Correct.

24   Q    Now, you talked about something you observed the night

25   before, that you saw a van.  Did you see the van at nighttime?

1   A      It was nighttime.

2   Q      Was it dark?

3   A      It was dark.

4   Q      And did you see something through the rearview mirror of

5   your vehicle?

6   A      Yeah.  I saw Boo Boo sitting in the van.

7   Q      Okay.  You think you saw Boo Boo.  What -- do you know --

8          MR. SCHATTNIK:  Objection, Your Honor.  He didn't

9   say, "I think I saw Boo Boo."  He said, "I saw Boo Boo."  So

10  that mischaracterizes his --

11         THE COURT:  Right.  That's what he said.

12  Q    (By Mr. Reilly) Okay.  You saw Boo Boo.  Do you --

13         THE COURT:  Sustained.

14  Q    (By Mr. Reilly) Do you recall what seat he was sitting

15  in?

16  A      He was on the passenger's side.

17  Q      And are you aware of whether Boo Boo has any relatives or

18  associates?  Do you know anyone else who's an associate or a

19  relative of Boo Boo?

20  A      That was in the Dismas House at the time?

21  Q      Not in Dismas House.  Just --

22  A      His brother.  He got a brother named Bub.

23  Q      Bub.  Okay.  And just for the record, Mr. -- Mr. -- or

24  Boo Boo -- Boo Boo was not in Dismas House at the time; is

25  that correct?

Case: 4:15-cr-00441-CDP Doc. #: 266 Filed: 11/27/18 Page: 45 of 114 PageID #: 1987
Jerome Lewis Redirect Examination                                Volume 6

45

1    A    Correct.

2    Q    And was Bub in Dismas House at the time?

3    A    No, sir.

4    Q    And then I think Mr. Schattnik asked you some questions

5    yesterday about a video.  Did you see a video while you were

6    at Dismas House after the shooting?

7    A    I did.  The shooting of James.

8    Q    Okay.  And Mr. -- Mr.-- Mr. Schattnik asked you some

9    questions about how it was that you saw the video; is that

10   correct?

11   A    Correct.

12   Q    And would you tell us what you saw on the video?

13   A    I saw when the van -- as -- it was like, probably, I

14   guess, when he was leaving the Dismas House.  He came out on

15   the front.  He was scrolling through his cell phone.

16   Q    And who is "he"?

17   A    James.  He wasn't paying attention to his surroundings.

18   Then he ended up walking down the steps, into the street,

19   going towards his vehicle, still playing with his phone.  Then

20   he ended up getting into his vehicle, and he sat in there for

21   like, I guess, a couple seconds or whatever.  It's like as

22   soon as he got ready to put his feet on the brake -- I mean

23   his brake lights came on.  The van stayed up the street, and

24   as the van was coming up the street, the passenger side door

25   was sliding open, and an individual jumped out and got in a

Jerome Lewis Redirect Examination                    Volume 6

46

1    stance and started shooting.

2    Q    And --

3    A    On the side of his car.

4    Q    Okay.  And did you see that -- was that shortly after the

5    murder happened that you saw that, that video?

6    A    It was actually the same night.

7    Q    The same night.  So the night of the murder, at some

8    point --

9    A    I came back into Dismas House.  I got to see the video.

10   Q    And who showed you the video?

11   A    Marcus.

12   Q    And I want to move forward to the time around July 23rd

13   of 2010, the murder of Darrion Williams.  When you saw that

14   shooting happen, did that trigger something for you?

15   A    Yeah.  The same stance that I saw the individual shooting

16   on that video was the same stance that O.G. was in when he was

17   shooting at Darrion Williams.

18   Q    Okay.  So you're not saying you can identify O.G. from

19   the video?  In other words, on -- when you saw the video right

20   after the murder of Ronald James, you didn't know who the

21   shooter was at that time, did you?

22   A    Not at the time, I didn't.

23   Q    But then as you flash forward into July 23rd of 2010,

24   that triggered something in your mind?

25   A    The exact same stance the individual on that video was

47

1    shooting in, that's the same stance he was in.  Like if that's

2    the stance that he used to, I guess, shoot or whatever.

3    Q    Some point after you saw the video or shortly after you

4    saw the video, did you have occasion to have a conversation

5    with Donald White?

6    A    Yeah.  I told White that I seen the shooting that

7    happened at the halfway house on the video.

8    Q    And did you tell him what was on the video?

9    A    Yeah, I told him.  I discussed it with him, told him what

10   was on it.

11   Q    And in terms of -- did you tell him about a vehicle on

12   the video?

13   A    About the van.

14   Q    Okay.  And that was shortly after the murder of Ronald

15   James?

16   A    Correct.

17   Q    I'm going to touch on a few things that Mr. Schattnik

18   raised today.  You -- Mr. Schattnik used the term that

19   Mr. Clemons was not -- not in the picture in reference to some

20   of your meetings or one of your meetings with Donald White.

21   Can you explain that, kind of what the nature of your

22   communications was with Donald White?  Would you tell us; were

23   there times you would communicate with him when you were

24   alone?

25   A    You mean like --

1  Q    Did you talk -- did you have one-on-one conversations

2  with White sometimes?

3  A    Majority of the time.  All the time.

4  Q    So the majority --

5  A    My communications with Mr. White.  Nobody else.  It was

6  just Mr. White and Mr. White only.

7  Q    Now, but if there were times when Mr. White was with --

8  were there certain times for -- for communications about

9  significant, serious, illegal activity, did you generally have

10 other people present or were you alone with Mr. White?

11 A    I mean I -- me and -- sometimes, Mr. White would have Boo

12 Boo with him because he was like his driver or his right-hand

13 man, you know, but when I would talk to him, I talked to him

14 one-on-one, except one time he was around when I did the

15 heroin deal with him and he was present right then and there.

16 Q    And so at some point, you had that kilo deal with -- with

17 Mr. White after the murder of Darrion Williams once he got

18 sideways with this guy you referred to as Guccio, who's also

19 Teague; is that correct?

20 A    Correct.

21 Q    And was there another time or at least one other time

22 where smaller amounts of heroin were involved?

23 A    Yeah.  When I had went down to his residence before he

24 got locked up, I had a sample of some heroin I had got from an

25 individual and I took it to him to test to see if he wanted to

1   get some because I told him I knew somebody that had it and if

2   he wanted to get it, then I could get it from the individual.

3   Q    And was Mr. Clemons present to help process that heroin?

4   A    He ended up coming in the house in the matter of time I

5   was talking.

6   Q    And just to explain the dynamics of what you're talking

7   about, if somebody sends you a sample, you're considering a

8   potential source; is that correct?

9   A    Correct.

10  Q    And why did you direct that sample to Donald White?

11  A    Because that's the field he was dealing in.

12  Q    And you're not necessarily a heroin guy, per se; is that

13  correct?

14  A    I'm not a heroin guy, but I could have gained some profit

15  from it if he wanted to buy some.

16  Q    So if the source was good, that potentially could benefit

17  you in some way?

18  A    Correct.

19  Q    If -- if you rip off -- Little D ripped you off.

20  Mr. Schattnik asked you some questions about what would happen

21  to your street credibility if Little D ripped you off with no

22  consequence.  If you in turn ripped Little D off, would that

23  restore or help restore street credibility if it had even been

24  diminished?  Can you tell us about that?

25  A    I mean it was just for my own self gain.  Something I had

1    lost -- I felt like I wanted it back.  It wasn't for like no

2    street credibility or none of that, for nobody to give back to

3    nobody, like I did this because of this or to do that.  No.  I

4    just wanted what was mine.

5    Q    All right.  Did you sell the car -- when you sold the

6    car, was that -- when was that?  Was that relatively close in

7    time to the murder?

8    A    I believe it was some time after that.  It was some time

9    down the way.  It was some -- some -- some -- way some months

10   after that.  I believe so.

11   Q    Did you -- did you say that that was on an occasion when

12   White and Wilson came to see you after the murder?

13   A    Correct.

14   Q    But you sold the car to Mutt, who was involved in the

15   murder; is that correct?

16   A    I did.

17   Q    You're a pretty surveillance-savvy guy; is that correct?

18   A    Correct.

19   Q    And it was your mother's car that you drove to do the

20   robbery of Darrion Williams?

21   A    Correct.

22   Q    Registered to your mother?

23   A    Yeah.  I mean I've been in the streets all my life.  So

24   if I'm knowing something was going to take place, why would I

25   use a vehicle that's registered to my mother when I knew it

1   could link back to my mother and link back to me.

2   Q    Now, you learned after the fact -- Boo Boo told you after

3   the fact that somebody was looking for you; is that correct?

4   A    Correct.

5   Q    Who was looking for you?

6   A    The old man, O.G.

7   Q    Did he tell you why O.G. was looking for you?

8   A    I mean he just kept saying he was looking for me, he was

9   looking for me.  So I asked Don, got in contact with Don, like

10  "Why is he -- why he keep looking for me?"  And that's when he

11  pulled up on me and told me like he hadn't paid him, you know,

12  for the robbery or whatever.

13  Q    Don told you that he hadn't paid --

14  A    O.G. for the robbery.

15  Q    So Mr. Schattnik asked you some questions about being

16  motivated by greed.  That's what drug dealers do; right?

17  A    Correct.

18  Q    And, apparently, the old man, the Defendant, he wanted

19  money too; is that correct?

20  A    I mean correct if he hadn't got paid.

21       MR. REILLY:  I have no further questions.

22       THE COURT:  All right.  You may step down.  Well, I

23  guess, members of the jury, we'll take another break while we

24  change witnesses.  So please remember the instructions I've

25  given you earlier about not discussing the case and keeping an

52

1    open mind.  We'll be in recess for just five minutes.

2        (The following proceedings were held outside the hearing

3    and presence of the jury.)

4            THE COURT:  All right.  You can take him.

5            Who's your next witness?

6            MR. REILLY:  Judge, the United States is going to

7    call Officer Josh Martin.  That will be followed by Chris

8    Seger and then followed by the custodian of records from

9    Barnes Hospital.  I think they're all relatively short

10   witnesses.

11       (Court recessed from 10:03 a.m. until 10:20 a.m.)

12       (The following proceedings were held within the hearing

13   and presence of the jury.)

14           THE COURT:  All right.  You all may be seated.

15           And you may call your next witness.

16           MS. DANIS:  Your Honor, the Government calls Joshua

17   Martin.

18           THE COURT:  All right.  Mr. Martin, if you'll come

19   over here to the clerk to be sworn.

20                     **JOSHUA PAUL MARTIN**,

21   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

22   FOLLOWS:

23                     DIRECT EXAMINATION

24   BY MS. DANIS:

25   Q    Can you introduce yourself to the Court please?

53

1   A    My name is Joshua Paul Martin.  I'm a police officer with

2   the St. Louis Metropolitan Police Department.

3   Q    How long have you been a police officer with the

4   St. Louis Police --

5   A    Approximately eight years.

6   Q    Okay.  And we've got a lady here taking down everything

7   we say.  So if you could just wait until I'm finished with my

8   question before you respond, that would help her out quite a

9   bit.

10  A    Yes, ma'am.

11  Q    Thanks.

12  A    Uh-huh.

13  Q    And I'm sorry.  How long did you say you had been

14  employed?

15  A    About eight years.

16  Q    What is your current assignment?

17  A    District 2, South Patrol.

18  Q    And what -- have you held that position the entire time

19  you've been in the police department?

20  A    I was in District 8 for approximately four years, and now

21  I'm in District 2 when the redistricting happened.

22  Q    What was your assignment in September of 2010?

23  A    Patrol.  Patrol officer.

24  Q    What were your duties as a patrol officer?

25  A    Handling radio calls, traffic stops, pedestrian

1   investigations, traffic tickets, parking tags, stuff of that

2   nature.

3   Q    Were some of your duties also attempting to conduct

4   arrests on people who were -- had active warrants and things

5   like that?

6   A    Yes.

7   Q    I want to draw your attention to September 12th and 13th

8   of 2010.  Were you working with a partner that day?

9   A    I was.

10  Q    And did you operate in uniform and in marked vehicles?

11  A    Yes, ma'am.

12  Q    Did you have occasion to respond to 711 North Euclid,

13  here in the city of St. Louis?

14  A    Yes.

15  Q    Can you tell us what it is that brought you to that

16  location?

17  A    We had received information that a possible suspect was

18  at that residence that had multiple active warrants.

19  Q    What was the name of that suspect?

20  A    Terrance Wilson.

21  Q    And if you could pull up Government's Exhibit 1G please.

22  Yes, please.

23       Do you recognize that photograph, sir?

24  A    Yes, ma'am.

25  Q    How do you recognize that photograph?

Case: 4:15-cr-00441-CDP   Doc. #:  266   Filed: 11/27/18   Page: 55 of 114 PageID #: 1997
Joshua Paul Martin Direct Examination          Volume 6

55

1   A     That is the Terrance Wilson subject.

2   Q     Okay.  And that's who you were seeking to locate on

3   September 12th of 2010; is that correct?

4   A     That's correct.

5   Q     Why is it that you responded to 711 North Euclid?

6   A     We went to that location to try to apprehend the suspect.

7   Q     And were you able to make contact with him on that

8   occasion?

9   A     On that occasion, no.

10  Q     Did you return the following day?

11  A     We did.

12  Q     And what, if anything, happened on the following day?

13  A     We received a phone call from an employee saying that

14  Terrance Wilson had entered the apartment complex.  I believe

15  it was Room 613.  So we responded there -- me and my

16  partner -- to do an arrest attempt.

17  Q     At some point when you responded, did you observe

18  Mr. Wilson exiting the building?

19  A     We did.

20  Q     And was he by himself, or did he have someone with him?

21  A     He had a small child with him that day.

22  Q     When you saw him exiting the building, where was he

23  exiting the building toward?

24  A     He was going towards a vehicle.  He was walking

25  eastbound, towards the parking lot.

56

1    Q    Can you describe that vehicle?

2    A    It was a blue vehicle with custom -- custom rims on it.

3    I believe it was a Caprice possibly.

4    Q    Okay.  What did you do when you saw him walking toward

5    that vehicle?

6    A    Me and my partner began to follow the suspect.  We kind

7    of parted our ways.  I went to the right.  He went to the

8    left.  The wanted card revealed that he was possibly armed

9    with a .40-caliber firearm.  So we approached cautiously, and

10   once he separated from the child, we -- we acknowledged who we

11   were.  We acknowledged we were St. Louis Police Department.

12   Q    Where was he standing when you told him you were with the

13   St. Louis Police Department?

14   A    He was standing to the right of his vehicle.

15   Q    Okay.  On the driver's side?  Would that be correct?

16   A    Correct.  Correct.

17   Q    Okay.  And what, if anything, did he do at that time?

18   A    I announced to him to put his hands in the air and step

19   away from the vehicle.  At that point, he disregarded all my

20   commands, entered the vehicle, closed the door, and started

21   the engine.

22   Q    Okay.  And did he leave right away?

23   A    He did.  He quickly pulled off to the right.  I quickly

24   moved to the right of the vehicle so I wasn't struck, and my

25   partner had to grab the small child that was actually standing

1    in front of the vehicle, who he was heading towards.

2    Q    Did he leave at a high rate of speed?

3    A    Yes, ma'am.

4    Q    And what did you do when he did that?  Did you inform

5    other officers that that had occurred?

6    A    I did.  I informed dispatch that the suspect was leaving,

7    going -- it would be northbound on Euclid, towards the park,

8    and after that, I couldn't see him anymore.  So he left in an

9    unknown direction, but I could still hear his car running.

10   Q    Did you -- a short time later, did you subsequently

11   receive information that a vehicle matching that description

12   had been involved in an accident?

13   A    Yes, ma'am.

14   Q    Approximately how long after you initially encountered

15   Mr. Wilson did you get that information?

16   A    It a few minutes.  Two to three minutes max.  Yeah.

17   Q    And then did you respond subsequently to the accident

18   scene?

19   A    We did.

20   Q    Was Mr. Wilson -- did he remain at the scene, or was he

21   no longer there?

22   A    He was no longer on scene.

23        MS. DANIS:  I want to show you a few pictures.

24        And at this time, Your Honor, I'd move for the

25   admission of Government's Exhibits 94A through 94F.

58

1          MR. STOBBS:  No objection.

2          THE COURT:  94A through 94F are received into

3    evidence.

4          MS. DANIS:  May I publish those to the jury, Your

5    Honor?  94A, please.

6    Q    (By Ms. Danis) Officer, can you tell us what we're

7    looking at in Exhibit 94A?

8    A    That is the front of the building at 711 North Euclid.

9    Q    Is that the door from which Mr. Wilson exited that

10   building?

11   A    Yes.

12   Q    And is that in fact you in that photograph, that we --

13   A    It is.

14   Q    -- can see in the reflection, taking that photograph?

15   A    That's correct.  My partner is right next to me.

16   Q    All right.  And then can we see 94B?

17        What are we looking at in 94B, Officer?

18   A    That is a picture of the parking spot where the vehicle

19   was parked.

20   Q    Okay.  And is it after you learned that that vehicle was

21   involved in an accident that you took these pictures for

22   evidentiary purposes?

23   A    Yes.

24   Q    And 94C please.

25        What's the significance of the photograph, 94C, Officer?

                                                                      59

 1   A    That's another picture of the parking lot where the

 2   suspect's car was at.

 3   Q    Okay.  And 94D.

 4        And let me ask you this; did you respond to the scene of

 5   the accident that two to three minutes later when you learned

 6   it had occurred?

 7   A    I did.  After we located the child's mother, we went

 8   directly to the scene.

 9   Q    Okay.  Do you recognize 94D, sir?

10   A    Yes.

11   Q    And can you circle the photograph -- and you can draw

12   right on that monitor with your finger.  Can you circle the

13   vehicle in which you saw Mr. Wilson leave that parking lot?

14   A    It's right here.

15   Q    And 94F please.  F, yeah.  Skip over E.

16        And is 94F a closeup of the damage to that blue vehicle

17   you had described earlier?

18   A    Yes, it is.

19   Q    Okay.  After September 13th of 2010, did you have any

20   further involvement in this investigation?

21   A    No, ma'am.

22        MS. DANIS:  All right.  I have nothing further, Your

23   Honor.

24        MR. STOBBS:  We don't object to the admission of 94F

25   either.  And no questions.

60

1           THE COURT:  Okay.  All right.  So it's already in

2   evidence.  So no cross.  You may step down, sir.

3           THE WITNESS:  Yes, ma'am.

4           THE COURT:  You may call your next witness.

5           MR. DELWORTH:  Thank you, Your Honor.  I would call

6   Officer Chris Seger, please.

7                          **CHRIS SEGER**,

8   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

9   FOLLOWS:

10                      DIRECT EXAMINATION

11  BY MR. DELWORTH:

12  Q    Would you state your name, please?

13  A    Chris Seger.

14  Q    What is your occupation?

15  A    A police officer with the City of St. Louis.

16  Q    How long have you been a police officer with the

17  St. Louis Metropolitan Police Department?

18  A    Twenty-one years.

19  Q    What is your current assignment?

20  A    I'm a patrol officer assigned to the Fourth District.

21  Q    I want to take -- take your attention back quite a ways

22  to July of 2000.  Were you with the St. Louis Police

23  Department during that period of time?

24  A    Yes.

25  Q    And what were your duties back in July of 2000?

61

1   A    I worked patrol in the Eighth District.

2   Q    I'd like to specifically have you focus on an incident

3   occurring on July 23 of 2000.  Did you have occasion to

4   respond to assist in the investigation involving a car stop?

5   A    I did.

6   Q    And where did this -- where was this car stop?

7   A    The 4600 block of North Market.

8   Q    That's within the city of St. Louis?

9   A    Correct.

10  Q    And when you arrived at the scene to assist, in terms of

11  the vehicle, how many occupants of the vehicle were there?

12  A    Two.

13  Q    Was identification taken with respect to the two

14  occupants in the vehicle?

15  A    Yes.

16  Q    Who were the two occupants?

17  A    Donald Stewart and Carlos Jones.

18  Q    And in terms of obtaining information in terms of -- this

19  is back in July of 2000.  Donald Stewart -- what -- what

20  address was provided?

21  A    I believe it was 5049 Northland.

22  Q    And with respect to -- you mentioned the second

23  individual was Carlos Jones?

24  A    Correct.

25  Q    And back in July 2000, what address was provided by

62

1   Carlos Jones?

2   A     I believe it was 5046 Northland.

3   Q     And are you familiar from your patrol area of -- you

4   mentioned that you were assisting at about approximately

5   4669 North Market.  You've indicated some addresses on

6   Northland; is that --

7   A     Correct.

8   Q     Approximately, a rough estimate, how much distance are we

9   talking about from Northland to that North Market location?

10  A     A total of about six blocks, about three blocks west and

11  about three blocks north of that location.

12  Q     And in terms of -- are you familiar with Northland there?

13  A     Yes.

14  Q     And in terms of the 5049 Northland where Donald Stewart

15  had provided his address and 5046 Northland where Carlos Jones

16  indicated he lived, what is the relationship between those two

17  addresses?

18  A     They're basically catty-corner, across the street from

19  each other.

20         MR. DELWORTH:  I have no further questions.  Thank

21  you.

22         MR. STOBBS:  No questions, Judge.

23         THE COURT:  You may step down.

24         MR. REILLY:  Judge, the United States calls Pam

25  Domian.

1                        **PAMELA DOMIAN**,

2    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3    FOLLOWS:

4                        DIRECT EXAMINATION

5    BY MR. REILLY:

6    Q    Will you state your name for the record?

7    A    Pamela Domian.

8    Q    What is your current business, occupation, or profession?

9    A    I'm the records custodian for Barnes-Jewish Hospital.

10   Q    How long have you been employed in that capacity as the

11   records custodian at Barnes-Jewish Hospital?

12   A    I've been employed as the records custodian for 15 years.

13   I've been at the hospital for 30.

14   Q    And has the entire 30-year tenure at the hospital -- have

15   you been involved in records keeping for the 30-year tenure?

16   A    Yes.

17   Q    And did you become the lead records custodian

18   approximately 15 years ago?

19   A    Correct.

20   Q    And as such, are you familiar with the manner in which

21   records are both created and retained in the hospital's

22   systems?

23   A    Yes, I am.

24   Q    And what are your responsibilities?

25   A    For the safekeeping and the accuracy of the records.

Pamela Domian Direct Examination                    Volume 6

64

1    Q    Does the hospital routinely keep records, diagnosis,

2    treatment -- records pertaining to diagnosis, treatment

3    information, and billing as required?

4    A    Yes, we do.

5    Q    And how are the records -- who requires that the records

6    be kept?

7    A    Joint Commission and Medicare.

8    Q    And does the Joint Commission relate to the licensing

9    review procedures for hospitals?

10   A    Yes.

11   Q    And does Medicare -- does that -- are those regulations

12   pertaining to billing and coding for billing?

13   A    Yes.

14   Q    And do the doctors in health care also routinely rely on

15   the information contained in these health care records?

16   A    Yes, they do.

17   Q    And are these -- these are the records of the regularly

18   conducted activity of the hospital; is that correct?

19   A    Correct.

20   Q    And is it the regular practice of the hospital to create

21   and retain these records?

22   A    Yes, it is.

23        MR. REILLY:  Thank you.  I'm going to -- may I

24   approach the witness, Your Honor?

25        THE COURT:  You may.

1    Q    (By Mr. Reilly) I'm going to hand you two documents that

2    are marked as 108.  One is a affidavit, and the other is a

3    compact disc.  Do you recognize the affidavit of records?

4    Does that identify what -- what the records are?

5    A    Yes, it does.

6    Q    And what's contained in the compact disc?

7    A    The medical records for Carlos Jones.  There are 3,379

8    pages.

9    Q    Okay.  And do a large portion of the medical records or a

10   portion of these pertain to an admission on or about

11   July 31st, 2009, in the late evening hours, and then

12   pertaining to treatment for the period between July 31st of

13   2009 until the discharge of Mr. Jones to St. John Mercy on or

14   about August 19th of 2009?

15   A    Yes.  Those records are on this CD.

16            MR. REILLY:  Thank you.

17            Judge, I'll move for the admission of Government's

18   Exhibit 108, both the affidavit and the CD.

19            MR. STOBBS:  Your Honor, subject to the objection

20   please.

21            THE COURT:  Yeah, they're admitted as discussed

22   earlier today.

23            MR. REILLY:  Thank you.

24   Q    (By Mr. Reilly) I'm going to direct your attention to

25   page 2,349 of the records.  And I'm going to ask to zoom in on

1  the top of the record.  This particular record -- do you

2  recognize this as a face sheet related to Mr. Jones' visit to

3  the hospital on or about July 31st of 2009?

4  A    The date of admission is not at the top of the screen

5  there, but, yes, this is a face sheet that contains his name

6  and address and unit history number, the patient type, a visit

7  in TCC, which is the Trauma Care Center.

8  Q    And what's the patient type?

9  A    TCC would be like the emergency room, so they call it the

10 Trauma Care Center.

11 Q    Thank you.  And I'm going to -- can we go to the very top

12 of the document for just a moment?  Thank you.

13       And so this is -- you recognize this as a patient -- it's

14 patient information regarding Carlos Jones; is that correct?

15 A    Right.  Yes.  And it has the Barnes-Jewish logo there,

16 and then over on the side, it has a print date of what day.

17 Q    And what's the print date?  Is that July 31st, 2009?

18 A    Yes.

19 Q    And then the address for this particular person, Carlos

20 Jones -- what is the address identified as?

21 A    5046 Northland Avenue.

22 Q    Thank you.  And I'm going to take you to the bottom of

23 the document.  Would you tell us what the record -- well,

24 what's the particular purpose of this record?  Before I get

25 into it, how does the hospital use this record?

67

1    A    Well, the face sheet gives the demographics of the

2    patient, of the information on the patient, and then on the

3    bottom here, it has the admit date and the time that they were

4    admitted to the ER.

5    Q    And was he admitted to the emergency room at

6    approximately 2310?

7    A    That's what it says here, yes.

8    Q    Okay.  So that's 10 minutes after 11:00 in the evening;

9    is that correct?

10   A    Yes.

11   Q    Thank you.  And this is -- the face sheet -- is that

12   created for every patient who comes into the hospital?

13   A    Yeah, every patient that comes into the hospital -- a

14   face sheet is generated.

15   Q    And this is the particular face sheet associated with the

16   admission of Carlos Jones on July 31st of 2010?

17   A    Yes, to the ER.

18   Q    Thank you.  To the emergency room.  And then I'm going to

19   direct your attention to page 2,350 and 51 of the records, and

20   I'll ask to start at the top.  Do you recognize this

21   particular document, and can you tell us what it is?

22   A    Yes.  It's the inpatient coding summary, and the coding

23   summary is part of our billing process.  The hospital coders

24   go in through the record and read the record to find out what

25   all happened during the stay, and then they have the admit

1   diagnosis and then the procedures or anything that was done,

2   secondary diagnoses.

3   Q    And would you tell us what coding means and why that's

4   important to the hospital?

5   A    Well, coding is -- every hospital uses coding for billing

6   purposes and for statistic information for health care.  It's

7   how the bill is generated.  So every illness or procedure has

8   its own code.

9   Q    Thank you.  So consistent with what you told us earlier,

10  these are records created and retained in the regular course

11  of the hospital's business?

12  A    Yes.

13  Q    And with regard to Mr. Jones, it reflects an admit date

14  of 8-1 of '09, and what is the discharge date?

15  A    8-19-09.

16  Q    Okay.  So the first record we saw -- can you tell us the

17  difference between the face sheet we saw for July 31st of '09,

18  during the late evening hours, and now this talks about the

19  admit date from 8-1 of '09 to the discharge date of

20  August 19th of '09.  What -- why the discrepancy in the time,

21  or can you explain the difference between the --

22  A    Yes.

23  Q    -- the face sheet and the admit date?  Yes, ma'am.

24  A    The face sheet has the time of the arrival for the

25  emergency room, and then the DRG is -- the inpatient coding

69

1   summary is just for inpatient.  So when he arrived on the

2   floor, then it gives you an admit date of 8-1-09 at 12:47 a.m.

3   That's what time he would have arrived on an inpatient floor.

4   Q    Okay.  And does this indicate that the disposition -- he

5   was to be discharged to an inpatient rehab facility?

6   A    Yes.

7   Q    And then what's the -- that DRG text?  Can you tell us

8   about that?

9   A    That would be the final code for what all they inputted

10  into the system.  That's the designated -- I'm not positive --

11  relating grouping, or I'm not sure on that.

12  Q    It indicates extensive burns or full-thickness burns with

13  a skin graft; is that correct?

14  A    Correct.

15  Q    I'm going to direct you to move down the code -- down the

16  page here.  Can you tell us the next -- this next section of

17  information -- can you tell us what this is indicative of if

18  we start at the top?

19  A    So the admitting diagnosis -- the coder has assigned this

20  code as the admitting diagnosis to the inpatient floor, and

21  the principal diagnosis -- that's the same reason, and then

22  there's the secondary diagnoses of the rest of the diagnoses

23  for his visit.

24  Q    Thank you.  And so we have full-thickness skin loss due

25  to burn, third-degree, not otherwise specified, of the

1    forearm; is that correct?

2    A    Correct.

3    Q    And then as you move down the diagnosis codes, can you

4    tell us what some of the other -- other indications are as we

5    move down into the secondary diagnosis text?

6    A    It will say what percentage of the body was burned for

7    third-degree.  That's a separate code.

8    Q    And what does it say in this case?

9    A    Fifty to 59 percent of the body burned and 50 to 59

10   percent third-degree.  And then the second one is a traumatic

11   compartment syndrome, upper extremity.  And the third is

12   full-thickness skin loss due to burn of the ear.  The fourth

13   one is full-thickness skin loss due to burn, hand,

14   unspecified.  And then the fifth one is full-thickness skin

15   loss due to burn, lower leg.

16   Q    Thank you.

17   A    Hyposmolality.  I'm not sure what that is.

18   Q    I put you on the spot.  I'm sorry.

19   A    Yeah.  Sorry.  The next, full-thickness skin loss due to

20   burn, face/head.  And then asthma, unspecified.  And then

21   accident caused by controlled fire, not in building structure.

22   And injury or poisoning occurring at/in unspecified place.

23   Q    And then I'm going to take you to the second of these

24   pages on the coding, and if we can start at the top.

25   A    So the procedure tests that were performed are listed

Pamela Domian Direct Examination                        Volume 6

71

1    here and --

2    Q    And we don't have to go through all of them --

3    A    Okay.

4    Q    -- but does it indicate there was a skin graft performed

5    on August 7th of 2009?

6    A    Yes.

7    Q    And another skin graft performed on August 14th of 2009?

8    A    Yes.

9    Q    Then I'm going to direct you to the bottom section.

10   That's among the other procedures outlined, but on the bottom

11   section, this also included on August 14th of -- strike that.

12   There was a transfusion of blood or components on August 7th

13   of 2009; is that correct?

14   A    Correct.

15   Q    And it references a split-thickness autograft as well on

16   August 14th of 2009?

17   A    Yes.

18   Q    I'm going to direct you to pages 2,352 and 2,353 of the

19   record.  This says, "Acute care transfer and authorization

20   order."  Do you -- what is this particular document?  It's

21   dated August 19th of 2009 at the bottom; is that correct?

22   A    Yes.

23   Q    All right.  And then I'm --

24        THE COURT:  Do you have another question?

25        MR. REILLY:  I do, Judge.

1    Q    (By Mr. Reilly) I'm going to direct you to the second

2    section of this, "Transfer Requirements."  Does this indicate

3    that the transferring agency is Barnes-Jewish Hospital and the

4    receiving facility is St. John Mercy Rehab?

5    A    Yes, it does.

6    Q    Thank you.  I'm going to direct your attention at this

7    point to page 2,653.  I'm sorry.  I have the wrong page.

8         I'm going to direct your attention to pages 2,562 through

9    2,564, and this particular record states, "History and

10   Physical"; is that correct?

11   A    Correct.

12   Q    And this is the Division of Plastic and Reconstructive

13   Surgery?

14   A    Yes, it is.

15   Q    And I'm going to move to the second page of this set of

16   records.  This also contains a diagram; is that correct?

17   A    Yes, it does.

18   Q    And is this another record that was created at or near

19   the time of the treatment?

20   A    Yes, it was.

21   Q    And the diagram depicts sections of burns, referencing

22   partial-thickness to full-thickness burns, and there are

23   various areas depicted on the arms, both arms, and hands, the

24   face, neck, and ear area?

25   A    Yes.

1   Q    Both the forearms and the back of the arms and then on

2   the right hand, both the inside and the outside of the hand;

3   is that correct?

4   A    Yes.

5   Q    And for the record, I've circled the marks on the

6   diagram.

7        And then I'm going to, finally, direct your attention to

8   pages 2,667 and 68, and do you recognize this particular

9   document as part of the record of Mr. Carlos Jones?

10  A    Yes.  It's the EMS report.

11  Q    And I'm going to direct your attention to the right-hand

12  side.  Does that give a time that EMS was dispatched?

13  A    Yes.  2231.

14  Q    Does it give a time that EMS arrived at the destination?

15  A    2237.

16  Q    I'm sorry.  Okay.  At the destination.  At what time did

17  it arrive at the hospital?  So it's at the scene.

18  A    Oh, I'm sorry.  At destination, yeah.

19  Q    It's dispatched at 2231.

20  A    2303.

21  Q    Okay.  So but your point -- I'm going to -- it goes

22  from -- it's dispatched at 2231, arrives at the scene or the

23  patient at 2237, and then departs the scene -- they're at the

24  scene, depart at 2256 and arrive at the destination at what

25  time?

1   A    2303.

2   Q    And then I'm going to direct your attention -- so the

3   actual EMS arrived at Barnes Hospital -- was dispatched at

4   2231 and arrived at the hospital at 2303, approximately 30

5   minutes after it was dispatched; is that correct?

6   A    Correct.

7   Q    And then I'm going to direct your attention back to -- if

8   we can just step back on the document for a minute.  Okay.

9   And then I'm going to direct your attention back to our

10  initial exhibit, the face sheet, at 2349.  So within a

11  relatively short time of arrival at the hospital, if the --

12  the exhibit reflected they were at the hospital at 2303 with

13  the EMS ticket, and then the time in the emergency room on the

14  face sheet is 2310; is that correct?

15  A    Correct.

16  Q    And that's the admitting date some -- or the admitting

17  time is documented some seven minutes after the ambulance

18  arrived at the hospital?

19  A    Correct.

20       MR. REILLY:  Okay.  If I may have just a moment, Your

21  Honor.

22  Q    (By Mr. Reilly) Can we step back for just a minute?  I'm

23  going to take you to 2,667.  Just for purposes of the record,

24  the date on the EMS ticket -- just so it's clear, that was on

25  July 31st of 2009; is that correct?

 1   A    Yes.

 2             MR. REILLY:  Thank you.

 3             If I may have just a moment, Your Honor?

 4             I have no further questions for this witness, Judge.

 5             THE COURT:  Cross-examination?

 6             MR. STOBBS:  No, ma'am.

 7             THE COURT:  All right.  You may step down.

 8             THE WITNESS:  Thank you.

 9             THE COURT:  You may call your next witness.

10             MR. REILLY:  Your Honor, at this time, the United

11   States calls Lieutenant Kenneth Binggeli.  Binggeli.  That's

12   B-I-N-G-E-L-L-I [*sic*].

13                      **KENNETH SCOTT BINGGELI**,

14   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15   FOLLOWS:

16                          DIRECT EXAMINATION

17   BY MR. REILLY:

18   Q    Will you state your name for the record?

19   A    Kenneth Scott Binggeli.

20   Q    What is your current business, occupation, or profession?

21   A    I am a lieutenant with the City of Bridgeton.

22   Q    With the police department?

23   A    Correct.

24   Q    And would you tell us -- would you outline briefly your

25   experience as a law enforcement officer for the ladies and

Kenneth Scott Binggeli Direct Examination          Volume 6

76

1    gentlemen of the jury?

2    A    I've been a police officer for 31 years.  I have done

3    everything from patrol all the way up to supervision,

4    including detectives.

5    Q    And what are your current -- would you tell -- that

6    actually takes me to my next question.  Would you tell us

7    about your current duties?

8    A    My current duties is I supervise 12 officers and three

9    supervisors on a patrol division.

10   Q    And then in your 30 years, you've had occasion to be

11   employed by Bridgeton Police Department for the last 19 years;

12   is that correct?

13   A    That is correct.

14   Q    And you worked with other municipalities prior to that?

15   A    Yes.

16   Q    Okay.  We're going to take you back a ways.  I'm going to

17   take you to August 17th of 1999.  Did you have occasion to

18   assist in a traffic stop that involved an individual named

19   Donald White?

20   A    Yes.

21   Q    And there were documents and reports associated with or

22   some documentation associated with that traffic stop; is that

23   correct?

24   A    There are.

25   Q    And that actually resulted in the arrest of Donald White

1   at the time; is that fair to say?

2   A     Yes.

3         MR. REILLY:  Judge, I'm going to, if I may, ask for

4   leave to approach the witness and just hand him the exhibit.

5         THE COURT:  You may.

6   Q    (By Mr. Reilly) For the record, I've handed you

7   Government's Exhibit 57.  Those are documents maintained by

8   the City of Bridgeton Police Department; is that correct?

9   A     Yes.

10  Q     And does that help you refresh your recollection in this

11  case?

12  A     It will, yes.

13  Q     Yes.  And I'm going to direct your attention to

14  August 17th of 1999.  Was Donald White in a vehicle that was

15  stopped for a traffic matter?

16  A     Yes, he was.

17  Q     And at some point, did the officers learn that Donald

18  White had traffic tickets or warrants related to other traffic

19  tickets?

20  A     Yes.  According to his documents, it looks like he had an

21  outstanding warrant with another municipality.

22  Q     And what was that municipality?

23  A     It looks like it was the city of Pagedale.

24  Q     And when -- when somebody has an outstanding warrant,

25  what obligation does that impose on a law enforcement officer

78

1   who encounters the individual with the outstanding warrant?

2   A    The individual would be arrested on that outstanding

3   warrant and conveyed to our station where he'd be held until

4   the other jurisdiction would come and pick them up.

5   Q    So if Mr. White is arrested in relation to a traffic

6   matter or contact with law enforcement officers in which they

7   discover he has outstanding traffic warrants, if he's arrested

8   in Bridgeton, he's detained and initially brought to the

9   Bridgeton Police Department; is that correct?

10  A    This is correct.

11  Q    And then what's the next step in the process?

12  A    We would notify the other jurisdiction, in this case,

13  Pagedale, let them know that he is at our facility, and they

14  would come over and pick him up and take him to their facility

15  so he could take care of whatever charges he may have at

16  their --

17  Q    So your responsibility as the officer who comes across

18  the individual is to arrest them, take them back to your

19  department, and then it's incumbent upon the originating

20  police department or authority to come take custody of the

21  individual?

22  A    Yes.

23  Q    And are you aware if that happened in this case?  Did

24  Pagedale take custody of Donald White?

25  A    Yes.  According to this document, it looks like it says

Case: 4:15-cr-00441-CDP   Doc. #:  266   Filed: 11/27/18   Page: 79 of 114 PageID #: 2021
Kenneth Scott Binggeli Direct Examination                Volume 6

79

1    that he was released to their authority.

2    Q    And what's -- typically, with a traffic matter and

3    outstanding warrants like this, is somebody held in custody in

4    the originating municipality either until they post a bond or

5    their case is disposed of?

6    A    Correct.

7    Q    That's kind of the standard operating procedure one way

8    or another?

9    A    Correct.  That would be a bond or -- unless the judge

10   ruled something different.

11   Q    Okay.  And during the course of the investigation or the

12   contact with Donald White, did Bridgeton Police Department

13   have occasion to obtain what we refer to as identifying

14   information or pedigree information?

15   A    Yes.  It would have been obtained when he was arrested.

16   Q    And what was Donald White's date of birth?

17   A    8-17 of '82.

18   Q    And did he give an address at a certain location?

19   A    Yes.  At this time, he gave the address of 1324 Gregan,

20   G-R-E-G-A-N, in Pagedale.

21        MR. REILLY:  Thank you.  I have no further questions

22   of this witness, Your Honor.

23        MR. STOBBS:  No questions, Judge.

24        THE COURT:  All right.  You may step down.

25        MS. DANIS:  Your Honor, the Government calls Enrique

80

1    Gutiérrez.

2          THE COURT:  Step right up here to the clerk.

3                  **ENRIQUE GUTIÉRREZ**,

4    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

5    FOLLOWS:

6                  DIRECT EXAMINATION

7    BY MS. DANIS:

8    Q    Good morning.  Can you introduce yourself to the Court

9    please?

10   A    Yes.  My name is Officer Gutiérrez.  Last name is

11   G-U-T-I-É-R-R-E-Z.  Badge number 144.

12   Q    How are you employed, sir?

13   A    I am employed with the Aurora Police Department.

14   Q    How long have you been with the Aurora Police Department?

15   A    Approximately 12 years.

16   Q    And Aurora is in Illinois; is that correct?

17   A    Yes, ma'am, it is.

18   Q    For a frame of reference, can you give us an idea of

19   where Aurora is in relation to Chicago, Illinois?

20   A    It's about 45 minutes west, taking I-88.  Another big

21   city that we have is Naperville.  A lot of people are familiar

22   with that as well.  So we're neighboring towns with them.

23   Q    Okay.

24   A    But I-88 does run into Aurora.

25   Q    What is your current assignment with the Aurora Police

1    Department?

2    A    I am a patrol officer.

3    Q    Have you been a patrol officer during your whole career?

4    A    Yes, ma'am.

5    Q    I want to draw your attention to November 20th of 2011.

6    Can you explain -- were you a patrol officer at that time as

7    well?

8    A    Yes, ma'am.

9    Q    What duties did you have as a patrol officer?

10   A    I was in -- we -- our areas are separated into districts.

11   We were assigned -- myself and Officer Martinez were assigned

12   District 2, which is the area of the Premium Outlet mall, and

13   we're assigned to patrol and do active, you know, community

14   engagement and stuff like that.

15   Q    So is that the Chicago Premium Outlet mall?

16   A    Yes, ma'am.

17   Q    And what kinds of calls were you responsible for

18   responding to as a patrol officer at that location?

19   A    Well, there, we're open to anything.  Domestics.  Inside

20   of the mall, we get a lot of retail thefts.  It's a very

21   high-traffic -- a lot of people going in and out.  Sometimes,

22   it's, you know, accidents.  It's a variety of different

23   things.

24   Q    Okay.  And you were responsible for responding to all

25   those types of calls?

Enrique Gutiérrez Direct Examination          Volume 6

82

1    A    Yes, ma'am.

2    Q    All right.  On November 20th of 2011, were you asked to

3    respond to a call around 8:30 p.m. at the Chicago Premium

4    Outlet malls?

5    A    Yes, ma'am.

6    Q    What was the nature of that call?

7    A    It was a suspicious person, suspicious activity.

8    Callers -- the mall security was actually calling for

9    assistance.  Reference, a possible intoxicated person.

10   Q    Did you respond with a partner at that time?

11   A    Yes, ma'am, I did.

12   Q    Who was that partner?

13   A    That was Officer Martinez.

14   Q    And when you responded, did you have occasion to

15   encounter that suspicious individual that the call was

16   referencing?

17   A    Yes, ma'am.

18   Q    Did you learn who that individual was?

19   A    Yes, ma'am.

20   Q    Who was that?

21   A    It was by the last name of Davis.  I think it's -- is it

22   Roger, I believe?  I'd have to look at my report to get his

23   first name, but his last name was Davis, Mr. Davis.

24   Q    Okay.  And did you observe Mr. Davis and his condition?

25   A    Yes, ma'am, I did.

1    Q    What, if anything, did you note about his condition?

2    A    He was seated on a bench.  It's an open mall, so it has

3    a -- it's a big mall, but it has an open roof where there's a

4    lot of benches.  It's an outdoor mall.  And he was passed out,

5    with his mouth open, reclined back on the bench in front of

6    the store of True Religion.

7    Q    In your occasion as a patrol officer, in your several

8    years on the force, have you had occasion to encounter people

9    who were under the influence of narcotics?

10   A    Yes, ma'am, I have.

11   Q    Did Mr. Davis appear to be under the influence of

12   narcotics to you?

13   A    Yes.  As we further investigated the issue, tried to wake

14   him up, at first, my first instinct was I thought he was

15   drunk, but then as I started speaking to him, his condition

16   was a lot worse.  It was very different.  With intoxicated

17   people, you do have more, you know, the odor, the totality of

18   circumstances with that, the stumbling.  His was -- there was

19   no odor of alcohol.  He did have slurred speech, glassy eyes,

20   but he was very, very hard to concentrate.  His sentences were

21   not making sense.  It just seemed he wasn't fully, fully

22   there, no matter after he woke up.

23   Q    Based on those observations, did you and your partner

24   search his person to find out if he had any items, illegal

25   items on him?

1   A    Yes, ma'am, we did.

2   Q    And what, if anything, did you locate?

3   A    We located a bottom of a Coke can, just the bottom part.

4   The top was cut off.  There was a little cotton ball on the

5   outer part, sitting into the divot at the bottom of the can.

6   Some burnt residue on both sides, one from where fire was

7   introduced, and on the other side, it was more of a burnt

8   residue around the cotton, the cotton ball that was located

9   there.

10  Q    Did you also locate needles on his person?

11  A    Yes, ma'am, we did.

12  Q    In your training and experience, are all of those items

13  consistent with the use of heroin?

14  A    Yes, ma'am, it is.

15  Q    And, in fact, were those items field-tested when you got

16  back to your department?

17  A    Yes, ma'am, it was.

18  Q    And did they test positive for the presence of opiates?

19  A    Yes, ma'am, it was.

20  Q    Now, after you made initial contact with Mr. Davis --

21  A    Uh-huh.

22  Q    -- did you have occasion to respond inside the True

23  Religion store?

24  A    Yes, ma'am, I did.

25  Q    Why is it that you responded inside the store itself?

85

1    A    Inside of the store, some of the workers there were

2    saying that the group -- there was a group, a group of

3    individuals.  They were -- they had like suspicious activity.

4    At first, the store thought that they were trying to steal a

5    few of the items that were inside of the store.  True Religion

6    is known for a very high retail theft problem.  As they were

7    watching the group, one of the sales associates saw one person

8    hand over a large item and placed into a bag, and they didn't

9    know if it was one of their items or what it was, but the

10   looking around, the -- just that paranoid look was the one

11   that triggered them off of something being suspicious.

12   Q    So did you respond to investigate further?

13   A    Yes, ma'am, and I did.

14   Q    Now, this group that you're referring to -- did that

15   consist of males and females?  Can you give us the ratio?

16   A    Yes.  I believe -- this is just off the top of my head.

17   To give an exact number, I would like to look at my report,

18   but I want to say there was two to three females and then it

19   was the group of males that were three.

20   Q    Okay.  There were three males as well?

21   A    Uh-huh.

22   Q    When you spoke to those males, did you encounter a male

23   by the name of Donald White?

24   A    Yes, ma'am, I did.

25   Q    All right.  And what, if any, interactions did you have

1    with him?

2    A    When I was investigating the group, I learned and

3    discovered a vacuum-sealed package of money.  It was a clear

4    plastic bag, but it was vacuum-sealed.  We couldn't actually

5    count to see how much money was in there, and as it was being

6    discovered, Mr. White became very antsy.  He did admit later,

7    as we were investigating, that the money did belong to him,

8    but his behavior was more of he wanted to run; he wanted to

9    get out.  We didn't know if he wanted to fight us or if he

10   just wanted to run away from us.

11   Q    Did you identify another male with him by the name of

12   Christopher Spates?

13   A    Yes, ma'am, we did.

14   Q    Did he initially provide you with his correct

15   information, pedigree information?

16   A    No.  He gave me a fake ID, and when I -- when I ran his

17   information, it wasn't coming back correctly.  Upon further

18   investigation, it was learned that -- that he gave his

19   brother's name and information.

20   Q    Okay.  What did you do with the vacuum-sealed package of

21   money that you found in Mr. White's possession?

22   A    We took digital photos of it.  We -- I called up the

23   sergeant, seeing what else further we can do with that, just

24   being the suspicious circumstances of it being vacuum-sealed,

25   a large sum, which was quite a few inches thick, you know, and

1    we -- we just documented the best we could.

2    Q    Okay.  And did you then return the money to Mr. White?

3    A    Yes, ma'am, we did.

4    Q    Did you have an opportunity to even remove that money

5    from the bag and count the money?

6    A    No, ma'am, we did not.

7           MS. DANIS:  Okay.  At this time, Your Honor, I'd move

8    for the admission of Government's Exhibits 103A through 103D.

9           MR. STOBBS:  No objection.

10          THE COURT:  All right.  103A through 103D are

11   received into evidence.

12   Q    (By Ms. Danis) And I'll display on the ELMO for you

13   Government's Exhibit 103B.  Do you recognize that photograph,

14   Officer?

15   A    Yes, ma'am.

16   Q    And how is it that you recognize that photograph?

17   A    It's the -- it's packaged in the ways that I remember

18   discovering it.

19   Q    Is this the package that you recall being in Donald

20   White's possession on that date in November of 2011?

21   A    Yes, ma'am.

22   Q    So on the top, that appears to be a $20 bill; is that

23   correct?

24   A    Yes, ma'am.

25   Q    And then I'll show you Government's Exhibit 103C.  Is

88

1    that a photograph of the back of that package?

2    A    Yes, ma'am, it is.

3    Q    And does that appear to be a $100 bill in the back of

4    that package?

5    A    Yes, ma'am.

6    Q    And 103D.

7         Did you and your fellow officers photograph kind of a top

8    view of that package?

9    A    Yes.

10   Q    And was that in order to document the thickness of that

11   wad of cash that you had seized?

12   A    Yes, ma'am.

13   Q    And does that appear to be what we're looking at in 103D?

14   A    Yes, ma'am, it is.

15            MS. DANIS:  I don't have anything further, Your

16   Honor.

17            THE COURT:  Any cross?

18            MR. STOBBS:  I don't have any, Judge.

19            THE COURT:  All right.  You may step down.

20            THE WITNESS:  Thank you.

21            Oops.  Sorry.

22            MR. REILLY:  The Government's next witness -- Your

23   Honor, the United States calls Rob Singh.

24            That's S-I-N-G-H.

25            THE COURT:  Step right here to be sworn.

Case: 4:15-cr-00441-CDP   Doc. #:  266   Filed: 11/27/18   Page: 89 of 114 PageID #: 2031
Rob Singh Direct Examination                                    Volume 6

89
1                          **ROB SINGH**,

2      HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3      FOLLOWS:

4                          DIRECT EXAMINATION

5      BY MR. REILLY:

6      Q      Will you state your name for the record?

7      A      My name is Rob Singh.

8      Q      Rob, would you tell us what your current business,

9      occupation, or profession is?

10     A      I'm a police officer with the City of St. Louis.

11     Q      Would you outline your assignments you've -- how long

12     have you been a police officer?

13     A      Approximately over 16 years, 17 years.

14     Q      Would you tell the ladies and gentlemen of the jury --

15     would you walk us through your assignments over the course of

16     your 17 years?

17     A      I've been assigned to District 7, District 8.  I am

18     currently in the Detective Bureau out of North Patrol.  I've

19     been assigned to Special Operations, Violent Offenders, Crimes

20     of Oppression, Narcotics.

21     Q      Numerous assignments within the department; is that

22     correct?

23     A      Correct.

24     Q      I'm going to take you back --

25                THE COURT:  Can you scoot your chair up a little bit

1    so you're closer to the mike?  Thank you.

2    Q    (By Mr. Reilly) I'm going to take you back to the time

3    around September 7th of 2010.  Where were you assigned during

4    that time frame?

5    A    District 7.

6    Q    And among the properties located in the Seventh District,

7    is the 5100 block Northland -- of Northland within the area or

8    was it within the area of your assigned patrol division?

9    A    Yes.

10   Q    And I'm going to direct you to the date of September 7th

11   of 2010.  Was there some information that you had obtained or

12   received during the day that led you to go to that

13   5129 Northland at or about 7:00 in the evening?

14   A    Yes.

15   Q    Would you tell us what the information was?

16   A    So at roll call that day, we were informed that there'd

17   been complaints of shots fired in the 50 -- so the 5100 block

18   of Northland is -- basically, it's like a double block.  It's

19   like -- it goes from 5000 to the 5300 block.  So it's a super

20   long block, double block, and we had a call for shots fired in

21   there.  It was probably maybe just a couple hours earlier that

22   we started our shift, and there was also an arrest made for a

23   drug violation in that same block.  I believe it was like

24   5211, which is just a few houses down from 5121 -- 5129.

25   Q    And there was an officer at the time; she was named

1   Jennifer Story.  Did you also have information from her

2   related to some narcotics activity that she had observed --

3   A    Yes.

4   Q    -- at 5129 Northland?

5   A    Yes.

6   Q    Was there other information you were aware of as well?

7   A    Yes.  So Officer Story -- she had information that there

8   was an individual selling heroin -- and known to be armed with

9   a firearm -- from 5129 Northland.  She had some -- a general

10  description of that individual.

11          MR. STOBBS:  Your Honor, I'm going to object as

12  hearsay.

13          THE COURT:  Yeah.  Sustained.  Why don't you go to

14  what he knows.

15          MR. REILLY:  I'll rephrase it, Your Honor.  Thank

16  you.

17  Q    (By Mr. Reilly) I'm going to -- based on all the

18  information you obtained, you headed to the area of

19  5100 Northland during the evening hours of September 7th of

20  2010; is that correct?

21  A    Yes.

22  Q    I'm going to direct your attention to Government's

23  Exhibit 33E.  And does this depict the general area of

24  5129 Northland?  I know it's on the -- perhaps, more prominent

25  on the west side, but does that depict the area of

1    5129 Northland?

2    A    Yes.

3    Q    And then I'm going to step back for just a moment to 33D.

4    That's a broader view of the entire area; is that correct?

5    A    Yes.

6    Q    And that's a reference -- that depicts the double block

7    or part of the double block?

8    A    Correct.

9          THE COURT:  And this one has north at the top instead

10   of north at the bottom like the other ones; right?

11         MR. REILLY:  Yes.  Yes, Judge.  And if -- actually, I

12   think it's -- I think is the south area -- yes.

13   Q    (By Mr. Reilly) Maffitt is the next street north of

14   Northland; is that correct?

15   A    Yes.

16   Q    So south is at the bottom; north is at the top on this

17   particular picture?  Is that correct?

18   A    Yes.  I'm sorry.

19   Q    Thank you.  Thank you.

20         MR. REILLY:  And, Judge, I believe we've moved for

21   the introduction of this exhibit.  If we haven't, I'd move for

22   it at this time.

23         THE COURT:  Yeah, it's been received.

24         MR. REILLY:  Thank you.

25   Q    (By Mr. Reilly) And I'm going to direct you now to

1  Government's Exhibit 34.  Do you recognize this photo, what's

2  depicted in this photograph?

3  A    Yes.

4  Q    And which unit is 5129 Northland?

5  A    5129 is going to be on the left side.

6  Q    Thank you.  And so would you tell us -- when you

7  responded to the scene, do you recall if you were in uniform?

8  A    Yes.

9  Q    Do you recall if you were in a marked car or an unmarked

10 car?

11 A    It was an unmarked car.

12 Q    And were you with another officer?

13 A    Yes.

14 Q    And what did you observe as you approached the property

15 at 5129 Northland?

16 A    I observed an individual that was leaning inside of a car

17 in front of 5129, and then there was also four individuals

18 that were sitting or standing on the front porch of

19 5129 Northland.

20 Q    In view of your training, experience, and the information

21 that you knew at the time, was there anything about the fact

22 that an individual was leaning into a car that attracted your

23 attention?

24 A    Yes.  Knowing that that's a block that has a lot of drug

25 activity and just based on previous experiences and knowing

94

1    that individuals do a lot of drug transactions leaning into

2    cars on the street, we just thought it was a little

3    suspicious.

4    Q    And so based on all of that, did you and the officer who

5    was with you intend to conduct some type of investigation even

6    if a very basic investigation at that point?

7    A    Yes.

8    Q    Would you tell the ladies and gentlemen of the jury what

9    happened?

10   A    So our intention was just to talk to the individuals, do

11   a voluntary field interview is what they're called.  We just

12   parked our car.

13           THE COURT:  Could you move the mike over a little

14   bit?

15           THE WITNESS:  Yeah.

16   Q    (By Mr. Reilly) Would you tell us what a field interview

17   is?

18   A    It's really just talking to -- to the citizens, just

19   having a conversation, and then, you know, kind of going from

20   there.

21   Q    So, essentially, you received information and complaints,

22   and you wanted to show up and, based on what you saw,

23   interview some people who were present in the area; is that

24   correct?

25   A    Correct.

95

1  Q    Eventually, did you determine the identity of the

2  individual who was leaning into the car?

3  A    Yes.

4  Q    And did you learn what his name was?

5  A    It was Donald White.

6  Q    Donald White?

7  A    Uh, Stewart.

8  Q    Donald Stewart.  Now, Mr. Stewart -- did you eventually

9  learn that he had a date of birth in the year of 1963?

10 A    Yes.

11 Q    And did you determine -- what else did you observe other

12 than -- you said you saw something other than Mr. Stewart

13 leaning into the car.  What else did you observe?

14 A    The four individuals that were on the front porch of the

15 residence -- they were in their mid to late teens.

16 Q    Could you circle the area of where Mr. Stewart was --

17 strike that -- where the individuals were on the front porch?

18 And is there a door to the property adjacent to that?  It's

19 somewhat difficult to see in the picture, but is there a door

20 in close proximity to those steps on the other side of the

21 porch?

22 A    Yes.

23 Q    And did you determine the identities of the individuals

24 who were on the porch?

25 A    We did.

1   Q     And were they young men?

2   A     They were.

3   Q     And do you recall their approximate ages?  Without the

4   exact dates of birth, do you recall their approximate ages?

5   A     Between 16 and 19 years old.

6   Q     And were they all young men?

7   A     Yes.

8   Q     So was there a -- did anything attract your attention as

9   to the age difference between Mr. Stewart and the young men on

10  the porch?

11  A     Yes.  Mr. Stewart -- I mean, he was approximately 30

12  years older than the individuals on the front porch.

13  Q     And I'm going to ask you; during the course of the field

14  interviews, were you able to determine any or were there

15  observations made during the course of contacting the

16  individuals that attracted your attention?

17  A     Yes.

18  Q     And what -- what did the officers observe or view at the

19  scene that attracted your attention?

20  A     So the front door to 5129 Northland was open, and it has

21  like the glass screen door, and just inside the doorway was a

22  chair, and it had two semi-automatic pistols that were on the

23  chair and a baggie that had some capsules with a white powder

24  and some just empty capsules that were sitting on the chair.

25  Q     And based on those observations, what, if anything, did

Rob Singh Direct Examination                              Volume 6

97

1   you and the other officers do next in the investigation?

2   A    From there, we talked to -- talked to the individuals

3   that we were speaking with.  None of them stated that they

4   actually lived at 5129 Northland.  From there, we asked them

5   if they knew about the -- about the firearms and the -- what

6   we believed to be heroin.  They denied ownership or denied

7   knowing anything about it.  And from there, we got ahold of

8   the building owner, and from there, we advised him of what

9   we -- you know, what we saw; there was a couple firearms and

10  some drugs that we saw there; we wanted to do --

11  Q    Can I step back for just a minute?

12  A    Yeah.

13  Q    So you -- after observing what you believed to be heroin

14  and capsules and guns, did all -- were all the individuals who

15  were on the porch asked if they lived at the residence?

16  A    Yes.

17  Q    Did any of them admit living at the residence?

18  A    No.

19  Q    Was Mr. Stewart asked if he lived at the residence?

20  A    Yes.

21  Q    And did he admit living at the residence?

22  A    He did not.

23  Q    Okay.  And the door was open, and those items were in

24  plain view; is that correct?

25  A    Correct.

98

1   Q    And then were the individuals asked if they possessed the

2   guns or the suspected narcotics?

3   A    Yes.

4   Q    Did everybody deny possessing the guns and the suspected

5   narcotics?

6   A    Yes.

7   Q    And so then you contacted the building owner.  Can you

8   tell us what kind of property this is, how many units there

9   are?

10  A    It's two units.

11  Q    Okay.  And who's the building owner?

12  A    It was Major Brinson.

13  Q    And what conversation, if anything, did you have with --

14  with Major Brinson, or did you obtain -- did you tell him what

15  you were concerned about?

16  A    Correct.  We were concerned about -- about the firearms.

17  At the time, we didn't know if they were loaded or not.  No

18  one was stating that they actually lived there.  We couldn't

19  get ahold of anyone there.  We didn't -- it just wasn't safe

20  to keep two, you know, what we thought were loaded firearms

21  just sitting there with no -- with no one, you know, paying

22  attention to them; no one saying that they owned them.

23  Q    And can I step back for just a minute?  Where was the car

24  that Mr. Stewart was leaning into?  Where was Mr. Stewart in

25  relation to the property?

1    A    Basically, right in front of this residence.  Kind of

2    where this picture is, basically, right in front there.

3    Q    So in front of what's depicted in 34.  He was in front of

4    the residence, leaning into a car?

5    A    Yes.

6    Q    Okay.  And then where -- in terms of where the guns and

7    the suspected narcotics were in relation to the front door, do

8    you recall; were they on the floor; were they on the ground;

9    were they on a -- on a table, or where were they?

10   A    They were on a chair that was just inside of the -- the

11   front doorway.

12   Q    So, in other words, it presents safety concerns for you;

13   is that fair to say?

14   A    Yes.

15   Q    All right.  You have training and experience with

16   firearms; you realize they can hurt somebody?

17   A    Yes.

18        MR. REILLY:  And I'm going to direct your attention

19   to Government's Exhibit 93.

20        Judge, I'll move for the admission of Government's

21   Exhibit 93.

22        THE COURT:  Is there any objection to 93?

23        MR. STOBBS:  No, ma'am.

24        THE COURT:  All right.  Exhibit 93 is received into

25   evidence.

100

1   Q    (By Mr. Reilly) Do you recognize this, this form that's

2   in front of you, Government's Exhibit 93?

3   A    Yes.

4   Q    And what is it?

5   A    This is a -- this is the form that we use when we -- it's

6   a "Consent to Search" form.  It's, basically, just a piece of

7   paper that we fill out with -- with the individual that gives

8   consent to search.  It could be a house, a residence, a car.

9   We have for computers, cell phones, things like that.

10  Q    And in this case, you asked for permission to search

11  what?

12  A    It was the residence at 5129 Northland.

13  Q    And did the building owner give you permission to search

14  5129 Northland?

15  A    Yes.

16  Q    And would you tell us what type of search was conducted?

17  A    So it was a very limited search because we were only

18  concerned with what was in plain view of the front door right

19  there, the firearms and what we believed to be heroin.  We

20  didn't do a consent -- we didn't search the entire residence.

21  We were just focused on what was within plain view right

22  there.

23  Q    And I'm going to direct you to the second page of this

24  consent form before we move on.  Major Brinson -- you obtained

25  his information.  His date of birth was November 23rd of 1961;

Rob Singh Direct Examination                                Volume 6

101

1    is that correct?

2    A    Yes.

3    Q    Okay.  Thank you.  And did you actually seize the items

4    that you had observed?

5    A    Yes.

6    Q    And what was -- did you determine what they were?  Can

7    you tell us the specifics?

8    A    One was a 9mm semi-automatic handgun, and the other one

9    was a .380 semi-automatic handgun.

10   Q    And does it sound -- that you had a Century Arms 9mm

11   semi-automatic handgun and a Davis Industries .380-caliber

12   handgun?

13   A    Yes.

14   Q    Were either of those weapons determined to be loaded?

15   A    No.  They did not have any cartridges in them.

16   Q    And then were all -- were the items or the evidence

17   marked, packaged, and delivered to the crime laboratory?

18   A    It was.

19   Q    Okay.  And were the items -- the evidence -- was it ever

20   worked in this case?

21   A    No.

22   Q    Why was that?

23   A    Since there was no arrest made with -- with the stuff

24   that was seized, the -- the drugs or the firearms, it's not

25   typical.  It's typical that it does not get worked because

102

1    there's not an arrest or charges that are to be followed.

2    Q    And the significance of the capsules -- would you explain

3    that again -- containing the powder?

4    A    So the capsules -- they're very common for street-level

5    drug sales.  A lot of times, what they'll do -- they'll take

6    the purest form of heroin that they can get.  They'll cut it

7    with some kind of cutting agent.  A lot of times, they'll

8    stick it inside of a capsule, just like a -- it's like an

9    Advil capsule or something like that.  You can buy just empty

10   capsules by themselves, and then they'll -- drug dealers will

11   fill it up.  Then they'll sell it.  You know, typically, it's

12   maybe about 10 dollars, five to 10 dollars a capsule.

13   Q    Over the course of your career as a law enforcement

14   officer, have you ever learned of or seen people barter

15   firearms for narcotics?

16   A    Yes.  It's very common.

17   Q    And then in terms of the limited search, I assume it was

18   a limited search just as you described; is that fair to say?

19   A    Yes.

20   Q    You didn't go through the entire residence?

21   A    No.

22   Q    Dealt with what your immediate concerns were and seized

23   those items?

24   A    Correct.

25   Q    And at the time, were you -- what was your assignment at

1    the time, sir?  Were you a patrol officer?

2    A    Yes.

3    Q    And is it typical -- how was this handled in terms of

4    responding to the citizen complaints or the problems in the

5    area?  How did you treat this particular investigation?

6    A    Umm, so citizen complaints are usually handled within the

7    district that they occur.  From there, we have officers that

8    would respond, whether it's drug activity, shots fired,

9    problem properties.  So we have different avenues.  We have

10   nuisance officers that can -- that can help with if there's a

11   lot of calls at a certain location, things like that.

12   Q    And this was treated as -- this was your response to the

13   complaints, or the problem property was something that you

14   handled within the district in this particular case; is that

15   correct?

16   A    Yes.

17   Q    Okay.  And during your time at the -- at the property,

18   when you conducted the investigation, nobody else approached

19   you and told you they lived at the residence or identified

20   themselves as the homeowners?

21   A    No.

22   Q    Is that correct?

23   A    No.

24        MR. REILLY:  I have no further questions for this

25   witness, Your Honor.

1          THE COURT:  Cross-examination.

2                    CROSS-EXAMINATION

3   BY MR. STOBBS:

4   Q     Had you desired, you could have applied for a search

5   warrant to search the entire premises; right?

6   A     We didn't -- we didn't believe that we had enough

7   evidence to do that.

8   Q     You could have -- you could have taken it, what you had,

9   and gone to an assistant prosecutor to try to get a search

10  warrant for the entire residence; right?

11  A     If we believed we had enough evidence to do that, yes.

12  Q     And here, you have a passel of firearms; right?

13  A     I'm sorry?

14  Q     You have a lot of firearms you found; right?

15  A     Two firearms, yes.

16  Q     You found drugs that you suspected were drugs?

17  A     Yes.

18  Q     You found other sorts of paraphernalia to make drugs that

19  are sold; right?

20  A     Yes.

21  Q     And you were talking a little bit about that you had

22  citizen complaints prior to this; right?

23  A     Yes.

24  Q     And you decided you didn't have enough information to get

25  a search warrant; right?

105

1   A    No, there was not enough information with what we had.

2   Q    You decided not to get a search warrant; right?

3   A    Correct.

4   Q    And you say that the -- you decided not to work the items

5   that you seized; right?

6   A    That's -- that's up to the lab.

7   Q    Well, and it's also up to the lab to -- to destroy

8   whatever is given to the lab; correct?

9   A    That's -- I'm not exactly sure on the guidelines for the

10   lab.  You'd have to speak to someone there.

11   Q    Sure, but I mean you gave -- you provided to them -- in

12   this particular instance, you provided them two firearms;

13   right?

14   A    Correct.

15   Q    And to your knowledge, no one went there and said, "Hey,

16   I want my guns back"?

17   A    Correct.

18   Q    And you said you searched for the owner of 5129

19   Northland; do you remember that?

20   A    Yes.

21   Q    And that was Major Brinson?

22   A    Correct.

23   Q    He lived there; right?

24   A    He lived at 5127.

25   Q    And he is an elderly gentleman as well compared to the

Rob Singh Cross-examination                                    Volume 6

1    other people; right?

2    A    I wouldn't say he's elderly.

3    Q    Well, I mean, compared to like teenagers, a

4    40-something-year-old guy is older; right?

5    A    I would say 40 is not.

6    Q    Well, nor would I, but it's -- it's -- it's -- the point

7    I'm making is that when you were talking to the prosecutor,

8    you were talking about the difference in age between --

9    between Donald and these young guys on the porch; right?

10   A    Yes.

11   Q    And it's about the same age difference that Major Brinson

12   had with these guys as well; right?

13   A    Yes.

14   Q    Who was -- the vehicle that you were talking to the

15   prosecutor about -- you said that you saw Donald leaning into

16   the vehicle; right?

17   A    Correct.

18   Q    And your assumption was that there was a drug transaction

19   going on; right?

20   A    It was just -- it was just very suspicious, but when we

21   saw that it was just him, I mean, obviously, it's not a drug

22   transaction.

23   Q    And could you tell the ladies and gentlemen of the jury

24   who was driving that vehicle?

25   A    There was no one in the vehicle.

Rob Singh Cross-examination                        Volume 6

107

1    Q    I'm sorry?

2    A    There was no one in the vehicle.

3    Q    So Donald Stewart was leaning into a vehicle that there

4    was no one driving it?

5    A    Yes.

6    Q    And did you do a pat-down of Donald Stewart?

7    A    I don't recall.  No.

8    Q    You didn't, did you?

9    A    No, not that I recall.

10   Q    And so part of -- you were talking about officer safety

11   when you went up to the house and through clear view you could

12   see these firearms; right?

13   A    Yes.

14   Q    And you were telling the ladies and gentlemen of the jury

15   that at roll call you had these -- there were complaints about

16   shots fired; right?

17   A    Correct.

18   Q    And someone with a gun -- for officer safety purposes,

19   you would be concerned about your own safety; right?

20   A    Correct.

21   Q    And when you stopped Donald, you never patted him down,

22   did you?

23   A    No.

24   Q    Have you ever heard of a guy named Trendley?

25   A    That doesn't sound familiar.  I mean --

1    Q    And no arrests were made; right?

2    A    No arrests were made.

3         MR. STOBBS:  No other questions, Judge.

4         THE COURT:  Redirect.

5         MR. REILLY:  Thank you.

6                     REDIRECT EXAMINATION

7    BY MR. REILLY:

8    Q    To your knowledge, Major Brinson never asked for these

9    guns; is that correct?

10   A    Correct.

11   Q    He never asked they be returned to him?

12   A    Correct.

13   Q    And as a police officer, sometimes things aren't perfect;

14   you do the best you can under the circumstance; is that fair

15   to say?

16   A    Correct.

17   Q    You have to make decisions and determinations just based

18   on --

19        MR. STOBBS:  Objection.  Leading.

20        MR. REILLY:  Strike that.  I'll rephrase it.

21        THE COURT:  Sustained.  Just ask him a question --

22        MR. REILLY:  Yeah.  Yes.

23        THE COURT:  -- a new question, not just going over

24   the old questions.

25   Q    (By Mr. Reilly) Aside from officer safety, did you have

1   concerns about unattended firearms other than a police

2   officer?

3           MR. STOBBS:  Objection.  Leading.

4           THE COURT:  Overruled.  Go ahead.  You can answer.

5   A    Can you repeat the question?

6   Q    (By Mr. Reilly) Do unattended firearms at a chair level

7   raise any concerns to you other than officer safety?

8   A    Sure.  I mean it's just a -- it's just a safety issue for

9   anyone.  I mean a child could pick up a gun.  I mean we -- we

10  hear about, you know, senseless shootings where, you know, a

11  young child picks up a gun, I mean, that's unattended.  You

12  know, no one's taking responsibility for the guns that are

13  there.  It's just -- I mean, it's just I think it's

14  irresponsible to leave, you know, if we were to leave them

15  there.

16          MR. STOBBS:  Objecting as to his opinion, Your Honor.

17          THE COURT:  Sustained.

18  Q    (By Mr. Reilly) Was that a consideration in this case?

19  A    Sure, it was a consideration.

20          MR. REILLY:  Thank you.  I have nothing further.

21          THE COURT:  You may step down.

22          You may call your next witness.

23          THE WITNESS:  All right.  Thank you.

24          MR. REILLY:  Judge, may we approach the bench?

25          THE COURT:  Yes.

1          (A bench conference was held on the record and outside of

2     the hearing of the jury as follows:)

3               MR. REILLY:  Judge, that's all the evidence we have

4     for today.

5               THE COURT:  Okay.  And then what do we expect

6     tomorrow?

7               MR. REILLY:  I'd say probably about the same, Judge.

8               THE COURT:  Okay.

9               MR. REILLY:  It may be something similar in terms of

10    duration, and then --

11              THE COURT:  And you guys have no objection to

12    breaking?

13              MR. STOBBS:  None.

14              THE COURT:  Nobody ever does in a trial, especially a

15    long one.  Okay.  Thanks.

16              MR. REILLY:  Thank you, Judge.

17          (The following proceedings were held within the hearing

18    of the jury.)

19              THE COURT:  Okay.  Members of the jury, we're going

20    to take our evening recess.  I mean this is all you're going

21    to have to do today.  We're going to have you come back

22    tomorrow morning.  I told you it might be a short day.  It was

23    even shorter than I expected.  Tomorrow, we need you to be

24    back, and it will probably be about the same.  You know, who

25    knows for sure, but when you're making your plans, you most

1    likely get tomorrow afternoon off, as you will today, and then

2    we will not be here Friday.  So you can make your plans.  Then

3    next week when we come back, we'll start up and go until we're

4    finished.  So this -- I don't expect to have -- you know, have

5    this happen again because we've got everybody scheduled.

6           So please remember the instructions I've given you

7    earlier.  Don't discuss the case among yourselves or with

8    anyone else, and you are excused until 9:00 a.m. tomorrow

9    morning, 9:00 a.m. on Thursday.

10        (The following proceedings were held outside the hearing

11   and presence of the jury.)

12          THE COURT:  All right.  So anything we need to talk

13   about before we come back?

14          MR. REILLY:  Judge, the only thing I'd ask -- and,

15   obviously, it's subject to the Court's schedule and

16   Mr. Schattnik and Mr. Stobbs and what their thoughts are on

17   it.  I don't know if the Court, during this time, whether it's

18   Thursday afternoon or sometime Friday, if the Court wanted to

19   consider a preliminary instruction conference just to at least

20   address the instructions preliminarily.

21          THE COURT:  Yeah, so -- and it's essentially what you

22   provided us before?

23          MR. REILLY:  But I've got to make changes, Judge.

24   We'll have a new packet, and I'll check with my office on

25   where we are because when we presented the instructions back

1   in December, we had it tailored for two defendants, and I

2   would hope we'd be in a position maybe sometime Friday to have

3   an instruction packet by then and at least get it to counsel

4   and have -- have preliminary conversations about the packet,

5   but I don't know --

6           THE COURT:  And so are you requesting that we talk

7   about -- have a preliminary instruction conference tomorrow?

8   Is that what you're -- is that what you're asking?

9           MR. REILLY:  Yes, Judge, tomorrow afternoon or

10  Friday, whatever, whatever pleases the Court and counsel.

11          MR. SCHATTNIK:  So I've got notes that I took on your

12  instructions on some problems, and I'll scan those and send

13  those to you, but I don't know if we'd be ready to really do

14  it tomorrow.

15          THE COURT:  Okay.  Well, why don't we -- see if you

16  can send each other whatever you have and then ask me again

17  tomorrow.  I'd certainly consider it, but I don't know.  You

18  know, I looked at them, but because it was so big and had

19  everything else in it, I haven't really studied them.  Some of

20  them are just the basic instructions, although, you know,

21  there are -- well, you all need to look at it and talk to each

22  other.  To the extent things can be worked out, I'd much

23  rather have you all do that before I get involved.

24          MR. REILLY:  Thank you, Judge.

25          MR. STOBBS:  There's only a handful that really

1    are --

2          THE COURT:  Okay.  And so -- so we can talk about it

3    tomorrow.

4          Mr. Reilly, this was the first time anybody's really

5    started objecting, but would you please stop repeating

6    everything your witnesses say and please stop leading it so

7    much just to make your points.  Redirect is not supposed to be

8    a little piece of your closing argument.  If -- if -- I mean

9    I -- you know, I sometimes threaten lawyers I'll start taking

10   time out of their closing arguments if they keep doing it.

11   Nobody's objected until now, but please.

12          MR. REILLY:  Yes, Judge.

13          THE COURT:  It's making me crazy.

14          Okay.  So court's in recess.

15        (Court adjourned at 11:39 a.m.)

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

       I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

       I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

       I further certify that this transcript contains pages 1 through 113 inclusive.

       Dated at St. Louis, Missouri, this 26th day of November, 2018.

                      */s/ Gayle D. Madden*

                    _____

                    GAYLE D. MADDEN, CSR, RDR, CRR

                      Official Court Reporter